UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION


ALLEN JOHNSON, ET AL.,              :        Docket No. 16-cv-1543
                                    :
                Plaintiffs,         :
vs.                                 :        March 10, 2021
                                    :
CHESAPEAKE LOUISIANA LP, ET AL.,    :
                                    :
                Defendants.         :
_____


REPORTER'S OFFICIAL TRANSCRIPT OF THE MOTION HEARING
VIA ZOOM BEFORE THE HONORABLE S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFFS:          ANDREW D. MARTIN
                             Davidson Summers
                             330 Marshall St., Ste. 1114
                             Shreveport, LA  71101

FOR THE DEFENDANTS:          NICOLE M. DUARTE
                             Jones Walker
                             811 Main St., Ste. 2900
                             Houston, TX  77002


REPORTED BY:         LARAE E. BOURQUE, RMR, CRR
                     Federal Official Court Reporter
                     800 Lafayette Street, Ste. 3103
                        Lafayette, LA  70501

```
 1                    P R O C E E D I N G S
 2          THE COURT:  Quick good morning to everybody.
 3          We're here for the oral arguments in a motion to
 4   reconsider the Court's previous ruling on partial summary
 5   judgment motions.
 6          We've got a number of people who are present with us on
 7   this Zoom video teleconference proceeding.  And I'm not going to
 8   go through a roll call of all of the attorneys who may be joining
 9   us by Zoom today.  There are only eight of you that -- or seven
10   of you that I can see that are actually using their video
11   portion.  And we have a court reporter present.  The rest of
12   everyone looks like they've either been muted -- let's see.
13   Randy Davidson is unmuted, and that's one of the problem areas
14   that I think has been corrected.
15          All right.  I'm not going to go down that list because
16   we'll be here the rest of the morning just going through the list
17   of attendees that was previously submitted, and from the Court's
18   viewpoint, the only people that are speaking today for the
19   plaintiffs will be Drew Martin, and for the defendants, that will
20   be Nicole -- is it Duarte or Duarte?
21          MS. DUARTE:  Duarte.
22          THE COURT:  Duarte.  Close, but no cigar.
23          MS. DUARTE:  Thanks, Your Honor.
24          THE COURT:  All right, then.  Is everybody ready to
25   proceed?
```

```
 1            MR. MARTIN:  Yes, Your Honor, we're ready.

 2            MS. DUARTE:  Yes, Your Honor.

 3            THE COURT:  All right.  I'm going to try this again.

 4       Ms. Duarte?  Close enough?

 5            MS. DUARTE:  Perfect.

 6            THE COURT:  All right.  You have the floor at this

 7  point, and if you'd go ahead and begin, and 20 minutes as an

 8  initial deal is fine, but I'm intending for this to be argued

 9  down.  So I don't want interruption by the other attorneys during

10  your argument, but if it takes 30 minutes, it takes 30 minutes.

11  If it takes 40, it's 40.

12            I will let you know that I will use Judge Don Walter's

13  rule of Scheherazade.  For as long as you entertain me, you may

14  speak.  When you cease to entertain me, it's off with your

15  screen.

16            So let's go ahead and get started on this as the

17  movant.

18            MS. DUARTE:  As long as it's not off with my head and

19  just off with my screen, I can live with that ruling, Your Honor.

20            THE COURT:  I changed the rule.

21            MS. DUARTE:  All right.  Thank you so much.

22            My name is Nicole Duarte.  I'm here today on behalf of

23  Chesapeake.  And I know that the Court has heard from these

24  parties and other parties in the related *Self* action on the same

25  issues.  So what I've tried to do is not start from the
```

1   beginning, but to read through particularly the Court's

2   discussion in the *Self* transcript, the *Self* argument transcript,

3   and try to focus my presentation today on the specific questions

4   and issues that the Court raised in that transcript.

5          So what I have is a PowerPoint.  It's not fancy, it

6   doesn't have any cool graphics, but what it tries to do is simply

7   outline Chesapeake's position and give you directly quotations

8   from the cases and the text of the statute that support the

9   position we're advocating today.

10          THE COURT:  And the Court will require that that

11   PowerPoint be emailed to chambers, and when it's emailed to

12   chambers, since it's actually a demonstrative aid for my purposes

13   in going back over your argument, please send a copy to

14   plaintiffs as well.

15          MS. DUARTE:  Of course.

16          THE COURT:  And you may just do a blast email saying

17   here's my PowerPoint.  That way I have something to refer back to

18   in summary form as opposed to the brief.

19          And we do have some new legal theories that were not

20   present in the first go-round, so to speak, in the *Self* case.  So

21   we have some new things to consider and reconsider in this

22   particular context.

23          So you have the floor again.

24          Thank you.

25          MS. DUARTE:  Understood.

1           And if I could share screen, please.

2           MS. GUILHAS:  You've got the ability.

3           MS. DUARTE:  All right.  I'm trying to find it.  I'm

4   not getting the icon for it.

5           MS. GUILHAS:  Down at the bottom.

6           MS. DUARTE:  Share screen.  There we go.

7           Okay.  Everybody can see that?

8           THE COURT:  Yes.

9           MS. DUARTE:  All right.  Excellent.

10           So I'd like to start off just with an articulation of

11   what Chesapeake's position is in the action because, as you said,

12   Your Honor, this has been refined a little bit over the course of

13   the case.

14           The conclusion that we're asking this Court to adopt is

15   that Louisiana Civil Code Article 2297 provides for the right of

16   reimbursement of post-production costs incurred by Chesapeake to

17   market plaintiffs' gas.  That is the source of the reimbursement

18   that we're advocating and asking the Court to adopt.

19           So in terms of the rationale for this that I'm going to

20   go through today, I've broken it down into three parts, and the

21   colors are there so that the slides are easy to relate back to

22   which argument we're talking about at the time or which part of

23   the rationale.

24           So first is the principle that it's settled law in

25   Louisiana that Section 10(A)(3) creates a quasi-contractual

1    relationship of negotiorum gestio.  This is done by operation of

2    law when a unit operator sells a UMO's gas.  And what I'm going

3    to focus on in that argument or that section of the argument is

4    the aspect of a quasi-contractual relationship.

5         I know that in the *Self* hearing, the Court expressed

6    concern over the extent to which the prescription cases can be

7    imported into this case to talk about what the right of

8    reimbursement is, are they just one-off cases or is it something

9    bigger.

10        And what I want to show the Court during this portion

11   of the argument is that what we're talking about is a

12   relationship.  It's a quasi-contractual relationship established

13   that imports the provisions of the Civil Code relating to

14   negotiorum gestio into a quasi-contractual relationship, a

15   contract with specific provisions and obligations for the

16   parties.

17        From there, I want to talk about the second part, which

18   is that Article 2297's reimbursement right is an express codal

19   term of the quasi-contractual relationship, and this goes to the

20   concern that the Court expressed in the *Self* hearing about gap

21   filling and equity and having to disregard express statutory law

22   in favor of equity.

23        And what I want to establish during that portion of the

24   argument is we're not talking about equity.  We're not talking

25   about gap filling.  What we're talking about is an express

```
 1   statutory codal provision that provides for a right of

 2   reimbursement.

 3            And then the last section that I want to address is the

 4   issue of conflict.  Given that we have 10(A)(3) and we have

 5   Article 2297, another expression of positive law, is there a

 6   conflict between those two provisions such that the phrase,

 7   quote, proceeds of the sales of production, trumps Civil Code

 8   Article 2297's reimbursement right.

 9            And under that are three kind of sub-rationales:

10            The first thing is the Court's duty to harmonize and

11   reconcile the acts, if possible, to avoid a conflict.  That's a

12   fundamental and -- I'll show the Court -- primary rule of

13   statutory interpretation.  That applies even absent a finding of

14   ambiguity.  So you don't have to find that it's ambiguous to have

15   to apply that rule.  That rule is something that's in the first

16   analysis, and it's very, very important in this case, because

17   it's your duty to try to find a peace between Civil Code Article

18   2297 and 10(A)(3).

19            The second portion is that "proceeds" simply means cash

20   and doesn't speak to the issue of post-production costs at all.

21   This is also something that I think the Court addressed, if not

22   directly, then indirectly, in the *Self* argument saying that

23   "proceeds" means proceeds.  It doesn't say "net."  It doesn't say

24   "gross."  It just means what you get from the sale.  In our view,

25   what you get from the sale simply means cash as opposed to the
```

1    kind of in-kind balancing that is ordinarily applicable to

2    working interests.

3            The last part of the argument relates to even if the

4    Court is going to read the term "proceeds" to mean gross

5    specifically, that doesn't by itself -- that doesn't expressly

6    exclude the application of this reimbursement right.  Nor does it

7    relieve the UMO of other obligations that can be set off against

8    that amount.

9            And the big item here is severance taxes.  And I will

10   suggest to the Court now, and I'll go into this in more detail in

11   a minute, severance taxes is the roadblock, I think, in this

12   case.  The way severance taxes operate are the same way that the

13   right of reimbursement under 2297 operates.  And I don't know

14   how, given the way that severance taxes operate and the

15   concession of all parties that they are allowed to be withheld

16   from the proceeds of the sale by the operator, why the necessary

17   and useful expenses can't similarly be withheld by the operator.

18           So that is the order of presentation, and I'll just

19   jump right in.

20           The first thing we're going to talk about -- or I'm

21   going to talk about -- is the settled law that there is a

22   quasi-contractual relationship of negotiorum gestio created

23   between the unit operator and the UMO when the operator sells

24   production, and this is something that happens by operation of

25   law, which is important, and we'll talk about that in just a

 1    second.
 2            So I started out here with the Louisiana Supreme Court
 3    authority on this issue.  And for some reason this doesn't always
 4    appear in all the briefing in any of the cases, and I'm not sure
 5    why that case doesn't -- and it doesn't appear in Judge Foote's
 6    decision in the *J&L* case.  She says the Supreme Court hasn't
 7    spoken on it.  Actually it has and here's where it's spoken on
 8    it.
 9            In the *Wells vs. Zadeck* decision in 2012, you'll see
10    the bolded sentence right here, "A quasi-contractual relationship
11    is created between the unit operator and the unleased mineral
12    interest owner with whom the operator has not entered into
13    contract."  And, again, after that, the Court uses the term
14    "relationship" again.
15            And in that decision the Court is relying on two
16    different cases for its discussion of this Louisiana
17    jurisprudence on unleased mineral interest, the *Taylor vs. Smith*
18    case and then the *King vs. Strohe* case.
19            In *Taylor vs. Woodpecker*, the Court again -- the
20    Supreme Court again talked about the relationship authorized by
21    the statute between an unleased interest owner and a unit
22    operator.  In that case the Court didn't specifically talk about
23    quasi-contractual or negotiorum gestor, but it is still talking
24    about a relationship, which is something that goes beyond just
25    prescription, that goes beyond just saying that the nature of

1     this cause of action for prescription purposes only is this.

2     This is a relationship in the words of the Supreme Court.

3         So now we look at the *Taylor vs. Smith* case, which is

4     the one that the Supreme Court relied upon in *Wells vs. Zadeck*.

5     And this case has a very long and good explanation of the exact

6     nature of the relationship that's created by 10(A)(3) and how

7     that fits into the Civil Code generally.

8         So the Court starts off talking about where there is no

9     written agreement, 10(A)(3) has supplied the terms of the

10     contract.  Okay?  And that's what the law is doing in this case.

11     It's creating a relationship by operation of law and it's

12     supplying the terms of the contract; not just 10(A)(3), but once

13     10(A)(3) creates a relationship of negotiorum gestio, then the

14     negotiorum gestio also create -- I'm sorry.  Are you speaking,

15     Your Honor?  You're on mute.  Oh, I'm sorry.

16         Okay.  I'm sorry.  I was confused.

17        THE COURT:  I have my law clerk with me on this.  I'm

18     in my conference room.  So if I start yakking, (a), either I'm

19     talking to you and I'm muted, or, (b), I'm not talking to you and

20     I'm muted.  In this case I can just go off video and mute, but

21     I'm still listening because that's the only way I can communicate

22     in Zoom with my law clerk.

23        MS. DUARTE:  I apologize.  I wasn't trying to

24     interrupt.  I just assumed --

25        THE COURT:  We have rules of how we do this.  I'm still

 1   messing around with this platform.  And that's why we have

 2   Jeanne Guilhas with us who is essentially our network engineer

 3   for all things Zoom.  I'm still learning what things mean and the

 4   icons and stuff on the screen, but Jeanne will tell me that I'm

 5   muted when I'm not supposed to be.

 6          I'm sorry.  Go ahead.

 7          MS. DUARTE:  No.  I apologize.

 8          Okay.  So back to where I was talking about *Taylor vs.*

 9   *Smith* and supplying the terms of the contract.  That's the first

10   relevant point.

11          In the second quote, the Court is talking about an

12   obligation of the unit operator imposed without agreement, but

13   instead by sole authority of the laws.  So here we have a

14   recognition that a law can create a relationship, right?  It can

15   create obligations beyond contract.

16          And if you look at Article -- Civil Code Article 1757,

17   which was cited by the Court in *Taylor v. Smith*, it's talking

18   about obligations arising directly from the law, and it

19   specifically mentions management of the affairs of another as one

20   of those instances.  So, again, we're talking about a

21   quasi-contractual relationship imposed by operation of law, by

22   positive law.

23          So, again, the Court talks about quasi-contract, and it

24   specifically identifies the nature of that quasi-contractual

25   relationship as negotiorum gestio, right?  "The operator, in

```
1    selling the owner's proportionate share of the oil produced, is
2    acting as a negotiorum gestor or manager of the owner's business
3    in selling the oil produced."
4            The last point is that Article 2295, now 2292, sets
5    forth the quasi-contract which results from the transaction of
6    another's business.  Again, we're talking about creating
7    something for all purposes, not just prescription.
8            King vs. Strohe is the other case cited by the
9    Supreme Court in Wells vs. Zadeck, and in that case, again,
10   you'll see this highlighted language, "Quasi-contractual
11   relationship."  I won't belabor that.
12           We have other cases as well since then that have
13   recognized this.
14           Taylor vs. Woodpecker.  This is the
15   First Circuit now.  The previous case, the Taylor case, was the
16   Third Circuit.  "The unit operator acts as negotiorum gestor."
17           Hackett.  "The law has settled on the proposition that
18   the landowner's -- the unleased landowner's cause of action is
19   quasi-contractual."
20           And then J&L vs. BHP in which Judge Foote of the
21   Western District has adopted these positions and says that the
22   Third Circuit has said that we're in quasi-contract, and, again,
23   this is based upon negotiorum gestio.
24           So these cases are not limited simply to the
25   prescription context in which they were decided.  That was the
```

1    issue except for the *J&L Family* case.  And they're not limited to

2    that for a couple of reasons:

3           One, as I've indicated, the courts are talking about

4    relationships.  They're talking about a relationship and a

5    contract, a quasi-contract, that's created by law and by the

6    voluntary act of being a unit operator and selling production.

7    Those relationships have incidence that go well beyond

8    prescription.

9           And, second, when doing that prescription analysis, the

10   courts aren't simply analogizing.  They're not just saying, well,

11   we don't know what the prescriptive period is here.  So it's sort

12   of like this kind of action, so we're going to pick that one.

13   What they're saying is we're tasked with determining the nature

14   of the cause of action, right, the nature of the cause of action

15   as the Court said in *Smith*.  So, again, that is something that's

16   much more fundamental than simply analogizing to some law to say

17   that prescription applies.

18          And you can see this from the *J&L* decision of

19   Judge Foote.  In that case the Court was looking to the

20   quasi-contractual provisions of the Civil Code to figure out

21   whether attorney's fees are authorized under 10(A)(3)).

22   Attorney's fees aren't mentioned in 10(A)(3), right, but the

23   Court's recognizing in that case that the incidence of a

24   quasi-contractual relationship goes beyond necessarily what's in

25   10(A)(3), right?  We're going to go look at the Civil Code

1    provisions generally on negotiorum gestio to find whether or not

2    attorney's fees are authorized.

3            Now, one other point I wanted to raise is that it's not

4    just the cases that talk about this kind of a relationship that

5    can be created with these kind of more far-reaching consequences.

6            So if we look at 30:10 itself, and 30:10(A)(2) for this

7    portion, there is an explicit recognition in that statute that

8    this kind of a relationship can be created.  And here this is

9    10(A)(2)(b)(ii)(dd).  And the Court is talking -- or the statute

10   is talking about the obligation of the unit owner to pay royalty

11   and overriding royalty to nonparticipating owners while the

12   drilling and production costs are being recouped, right?  During

13   that recoupment period, the unit owner is still supposed to be

14   paying the royalty and overriding royalty amounts to the

15   nonparticipating owners so that they can pay their royalty

16   owners.

17           And what the statute says is, "Except as provided in

18   this paragraph, the drilling owner's obligation to pay the

19   royalty and the overriding royalty to the nonparticipating owner

20   in no way creates an obligation, duty, or relationship between

21   the drilling owner and any person to whom the nonparticipating

22   owner is liable to, contractually or otherwise."

23           And I think what this provision is saying is we're

24   recognizing that a court might find basically a third-party,

25   beneficiary-type relationship could be created by this duty that

1    we're imposing on the unit owner to pay the amounts or the

2    royalties, and the statute is saying, no, that doesn't happen.

3              So I think this is relevant for two reasons:  One is

4    the fact that it shows that such a relationship is envisioned,

5    and, two, that there's exclusionary language that can prevent it,

6    right, that the legislature knows how to do that when it wants

7    to.

8              We don't have that kind of exclusionary language on

9    negotiorum gestio in 10(A)(3).  We don't have anything like that,

10   but here above in the same statute the legislature saw fit to try

11   to exclude a relationship it knew could be created.

12             So that's the first portion, which is basically what we

13   have is our quasi-contractual relationship of negotiorum gestio.

14             The second portion is that now we have an express

15   positive law outside of 10(A)(3) that gives a right of

16   reimbursement for post-production costs, and that is Civil Code

17   Article 2297.  "The owner whose affair has been managed is bound

18   to fulfill the obligations that the manager has undertaken as a

19   prudent administrator and to reimburse the manager for all

20   necessary and useful expenses."

21             So, again, here we're talking about positive law.

22   We're not talking about gap filling.  We're not talking about

23   equity.  We're talking about express statutory law.  And it's a

24   situation in which the Civil Code is supplying this provision as

25   a term of the quasi-contract that is created by the operator's

1    sale of minerals under 10(A)(3).

2          So that leaves us two different statutory provisions,

3    two potentially competing statutory provisions.  One is 10(A)(3)

4    and one is Civil Code Article 2297.

5          I've reproduced the text of 10(A)(3) here, but what

6    we're focusing on, I believe, is the bolded language, "The

7    proceeds of the sale of production."  "The operator shall pay to

8    such party or such parties such tract's pro rata share of the

9    proceeds of the sale of production within one hundred eighty days

10   of such sale."

11         So now let's talk about whether there is a conflict

12   between those two provisions.

13         Now, I think the first issue to address, because this

14   is something that the Court talked about extensively in the *Self*

15   transcript, which is the rules of statutory construction that

16   apply in this case.  And I believe that the word that the Court

17   used, what's threshold, what's not threshold; what is only

18   dependent upon ambiguity, you know, what allows this to look at

19   things only when Your Honor has determined that an ambiguity

20   already exists; and what do we look at on the front end as our

21   threshold or what I'm going to call primary matter.

22         So what I'd like to point the Court to is Civil Code

23   Article 13.  "Laws on the same subject matter must be interpreted

24   in reference to each other."

25         And if we look at what the Supreme Court has said about

```
1    that provision, it says that when statutes seem to conflict, this
2    article makes it this Court's duty to harmonize and reconcile the
3    acts if possible.  This is huge because this duty to harmonize is
4    on the front end, and it's before the rule that says specific
5    applies over general.  You don't get to specific applies over
6    general until you find a conflict, and you don't get to a
7    conflict until you've undertaken this duty to harmonize the acts
8    if possible.  This is a primary rule of statutory --
9              THE COURT:  Stop if you would.  Go back to your slide
10   on 30:10.  I want to be sure that I understand how this
11   exception, except in this paragraph -- I'm sorry.  Keep going.
12   Go to your next slide.
13              Okay.  It's back.  I'm sorry.
14              MS. DUARTE:  That's okay.  I'm working on learning all
15   of these buttons, too.
16              THE COURT:  Yeah.  Boy, isn't that the truth.
17              MS. DUARTE:  I had my son come over last night to try
18   to make sure I didn't turn myself into a cat.
19              THE COURT:  You've got to have somebody younger.
20   That's true.  Twelve-year-olds pick this right up.
21              Look at the one in green.  Is that the one that we're
22   looking at just above -- no.
23              MS. DUARTE:  So the green one sets out 2297.  The next
24   one is the language.
25              THE COURT:  Let's see.  It is concerning your second
```

```
 1   point, the need to harmonize.
 2            MS. DUARTE:  Okay.  The harmonizing?
 3            THE COURT:  It's the one after that because it talks
 4   about...
 5            MS. DUARTE:  Okay.  The two slides that I have on
 6   harmonizing are this one that I just talked about, and then --
 7   whoops -- then the following one where I was going to talk about
 8   the Court's language showing that it was primary.
 9            THE COURT:  We've just gone to our enormous TV screen,
10   and it is the one in your list at the very top on the left margin
11   in red.
12            Yeah.  That's the one.
13            I'm going to go off screen because I need to look at
14   the entirety of the provision here.  So I'm going to hide the
15   video panel.
16            But I guess the issue for me, you claim that it may
17   establish a legal relationship by operation of law, and this one
18   says, "Except as provided in this paragraph, the drilling owner's
19   obligation to pay the royalty and overriding royalty to the
20   nonparticipating owner..."
21            Is a nonparticipating owner in the same class as an
22   unleased mineral owner?  Are those fungible terms?
23            MS. DUARTE:  For this particular provision?
24            THE COURT:  Yes.
25            Let's talk about generally in the oil and gas industry.
```

```
1              Are those fungible terms or is there a difference
2     between an owner who has leased property becoming an overriding
3     royalty, okay, or is what I call an NPO and a UMO part of the
4     same class?
5              MS. DUARTE:  Well, NPOs, as you're using that term --
6     and UMOs are not interchangeable because you can have a
7     nonparticipating owner who is leased who just decided not to
8     participate or they could be nonparticipating because they were
9     never notified.
10             THE COURT:  Okay.
11             MS. DUARTE:  I think those are the two situations that
12    10(A)(2) envisions having a nonparticipating owner.
13             THE COURT:  All right.  And then it says, "In no way
14    creates an obligation, duty, or relationship."
15             You're using the express language of the statute saying
16    in no way creates an obligation, duty, or relationship to say
17    that it contemplates a relationship.
18             MS. DUARTE:  Yes.
19             THE COURT:  Is that your point?
20             MS. DUARTE:  That's the first part of it.
21             THE COURT:  And then your argument is that if the
22    legislature can exclude operation of law relationships in
23    10(A)(2), they could have done this in 10(A)(3)), but didn't?
24             MS. DUARTE:  That's part of it, yes.  I mean, I think
25    that 10(A)(2) shows a recognition that absent some sort of
```

 1   exclusion like this, just giving someone a duty under a statute
 2   could have bigger implications.  It could create a relationship
 3   that has other associated duties and obligations, like in this
 4   case, a third-party beneficiary.  And I think it shows that the
 5   legislature, when it recognizes that possibility exists, can
 6   specifically exclude that in the statute so everybody knows, hey,
 7   we're going to make you pay this, but we're not going to import
 8   all of that other stuff.  So, yes.  That's exactly what I'm
 9   arguing from this provision.
10          THE COURT:  Sorry.  I did not mean to interrupt the
11   flow of which you were presenting, but I couldn't resolve in my
12   mind what you were actually using that provision for.  I get it
13   now.  I'm sorry.  Can you go back to your regular slide?
14          MS. DUARTE:  This is your meeting and I'm happy to
15   answer any questions you have at any stage, Your Honor, of
16   course.
17          We were, after this, going to the harmony, the duty to
18   harmonize, right?  And so we talked about Civil Code Article 13.
19   We talked about *Walker* and the Supreme Court's interpretation of
20   that.
21          What I wanted to make the point of in the next slide
22   was the primary nature of that rule of statutory construction
23   because I know that Your Honor talked about, well, do I not get
24   to that, or multiple other rules.
25          THE COURT:  And that's one of the concerns I have.

1           The Mineral Code in our state is rather unique because
2   it's the primary source of all things oil and gas, is it not?
3           MS. DUARTE:  Well, are we talking about the Mineral
4   Code proper because 30:10(A)(3) is not part of the Mineral Code
5   proper.
6           THE COURT:  Right.
7           So we've got the Mineral Code which is primary as to
8   all things.  Now we're in Title 30 and now we're in Civil Code.
9           So I hate to say this, but this is gap filling as to in
10  what order do you take this and which source is primary for
11  consideration and which source has become primary because of a
12  failure to speak in the Mineral Code or other statutes.  That's
13  the rub as far as I'm concerned.
14          MS. DUARTE:  And I would respectfully disagree in terms
15  of the gap filling nature.
16          So when you're in the Mineral Code proper, the Mineral
17  Code proper has Article 2, and it says this is the Mineral Code,
18  and in the event of a conflict, the Mineral Code prevails over
19  the Civil Code or other statutory law, but there has to be a
20  conflict.  And it also specifically says when the Mineral Code
21  doesn't speak to it, the provisions of the Civil Code govern.
22  Okay?
23          So there's an express rule in the Mineral Code to
24  resolve this issue and to tell you when it's primary or really
25  when it trumps, right, when it's going to override something in

1    the Civil Code, and that's only when it's spoken to the issue and

2    that's only when it's spoken to the issue in a way that conflicts

3    with the Civil Code.

4         So we're not in the Mineral Code proper.  So 10(A)(3)

5    isn't subject to that rule I don't believe.  I haven't seen

6    anything that says it is.

7         THE COURT:  That's one of my concerns in this as to

8    which provision or provisions control in this circumstance.

9         So we're on track.  I get where you're coming from.  I

10   just wanted to tell you that's one of my concerns that you do

11   need to address.

12        MS. DUARTE:  And that's -- I got that from the *Self*

13   transcript as well, and that's what I'm trying to do, I guess,

14   with this provision.

15        Now, I will tell you this:  When you go and you read

16   kind of any Louisiana Supreme Court case that deals with

17   statutory interpretation, it's a potpourri of stuff, right?  They

18   will sometimes use ambiguity in front of a rule.  They will

19   sometimes not use ambiguity in front of a rule, a particular rule

20   of statutory construction.

21        But this citation here, this quotation that I have, is

22   the best example that I could find where the Court actually tried

23   to reason it out and tried to delineate what are the primary

24   rules and what are the secondary rules.  And that term,

25   "secondary rules," is the Supreme Court's right here in this

1    quote.

2         And so if you leave this quote in and you look at it,

3    it's saying, "When a law is clear and unambiguous and its

4    application doesn't lead to absurd consequences, it shall be

5    applied as written, with no further interpretation made in search

6    of the legislature intent."

7         Okay.  Primary rule.  We're starting there.

8         "The starting point for interpretation of any statute

9    is the language of the statute itself.  Additionally, all laws

10   pertaining to the same subject matter must be interpreted in

11   pari materia, or in reference to each other."  Civil Code

12   Article 13 which I just showed you.

13        Now we're departing from primary rules of statutory

14   interpretation.  We're going to secondary.  "When, on the other

15   hand, a statute is not clear and unambiguous, or its application

16   leads to absurd consequences, we rely on secondary rules of

17   statutory interpretation to discern the meaning of the statute at

18   issue.  In such cases, the statute must be interpreted as having

19   the meaning that best conforms to the purpose of the law."  And I

20   forget if that's Civil Code -- let's see.  It might be 11.  Ten.

21   That's ten.  And then, "Moreover, when the words of a law are

22   ambiguous, their meaning must be sought by examining the context

23   in which they occur and the text of the law as a whole," and

24   that's Civil Code Article 12.

25        So the way that the Court divides it up in this case is

```
 1    to put that in pari materia.  It must harmonize the rule as a

 2    primary rule of interpretation.  It's something you have to deal

 3    with whether or not you find the language in the statute is

 4    ambiguous.  It's something you have to deal with along with

 5    applying the law as written along with not leading to absurd

 6    consequences.

 7                And that's -- I hope that answers the Court's question

 8    for purposes of how we deal with a non Mineral Code statute like

 9    10(A)(3) and Civil Code Article 2297 when someone is arguing that

10    there's a conflict between those.

11                THE COURT:  It certainly helps in terms of the

12    analytical framework of the argument.

13                MS. DUARTE:  Okay.  Great.

14                So our position is that we're looking at the words,

15    right, we're looking at the absurd consequences, but at the same

16    time we're looking at 2297, another enactment of positive law,

17    and we're harmonizing if possible.  Only if we cannot harmonize

18    those two do we get to the rule that if there's a conflict, the

19    more specific prevails over the general, and we don't think we

20    get there.  We believe that it is entirely possible to harmonize

21    these two statutes, just as we do in the context of severance

22    taxes, and find a way that they live together.

23                Okay.  So now moving to apply that whole kind of

24    statutory construction interpretation analysis.  Here's what we

25    see in 10(A)(3).  Really here's what we don't see.
```

 1            10(A)(3) doesn't expressly exclude a right of

 2    reimbursement of necessary and useful expenses under 2297.  It

 3    doesn't say anything like that.  It doesn't state expressly that

 4    the UMO is entitled to the payments of the proceeds of the sale,

 5    you know, without deduction for any post-production costs.  No

 6    language like that.  It doesn't expressly exclude the creation of

 7    a negotiorum gestio relationship like that provision of 10(A)(2)

 8    did for third-party beneficiaries.

 9            And really 10(A)(3) doesn't even say "gross."  A lot of

10    the analysis to date has kind of assumed that that's what it

11    means or that's what it potentially means.  It doesn't say that.

12    It just says, "Proceeds of the sale of production."  So that's

13    what we're working with now, and what we're trying to determine

14    is, given all of those things not being there, does 10(A)(3)

15    really absolutely necessarily conflict with 2297's right of

16    reimbursement.

17            THE COURT:  Oh, let me ask you one other thing.

18            When you -- your slides are numbered over in the

19    margin, but they're not numbered themselves.  If you could

20    transfer the numbers that are shown in my far left margin here to

21    the actual slide itself, it would really help us seeing something

22    as large as we can see it on the screen as opposed to having to

23    really squint with a magnifying glass up there.  That's just a

24    little technical issue.

25            MS. DUARTE:  And I apologize.  I actually have the

1   notes enabled, so it covered up.  There's a teeny-tiny little

2   page number down there.  I know it's really teeny tiny in the

3   right-hand corner.  Let me put it on -- you know what?  Let's do

4   this.

5           THE COURT:  That's all right.  It just helps in terms

6   of us being able to know which slide to go back to.

7           MS. DUARTE:  Understood.

8           And if that needs to be bigger, I can absolutely do

9   that.

10          THE COURT:  Okay.  It will just help us after the

11  arguments have been concluded today.

12          MS. DUARTE:  Okay.  Of course.

13          So we're talking about what the statute doesn't say.

14  It doesn't have any express language in 10(A)(3) that would say

15  2297 doesn't apply, negotiorum gestio doesn't apply, none of

16  that.

17          What we also know is that silence isn't enough, right?

18  It's not enough -- if the statute doesn't even actually address

19  it, that's not enough to create a conflict.  That's not enough to

20  displace other potentially applicable provisions of the Civil

21  Code.

22          And I've cited the *J&L* case again here, which is the

23  case Judge Foote decided regarding attorney's fees.  Even though

24  10(A)(3) doesn't expressly mention attorney's fees, the Court

25  looks to those quasi-contractual Civil Code articles to see if

1    there was a right for attorney's fees provided for there.  This

2    is because the terms of this quasi-contractual relationship can

3    come from outside 10(A)(3) once that statute has created this

4    negotiorum gestio relationship by operation of law.

5            Now, it is our position that 10(A)(3) is silent on the

6    issue of post-production costs for UMOs, and it's silent because

7    the phrase "proceeds of the sale of production" really just means

8    in cash, right?  It really just means the money you get from the

9    sale as opposed to the kind of in-kind balancing that is

10   preferred for other working interest owners.

11           I've cited this *Hunt Oil v. Bachelor* case.  This is the

12   one where the Supreme Court's talking about the preference for

13   in-kind partition for general working interest owners, and the

14   Court distinguishes here UMOs in this footnote.  And it says, "We

15   note that the legislature has statutorily resolved the gas

16   imbalance issue where an unleased owner is involved."  And it

17   quotes 10(A)(3) and the Court italicizes "proceeds," right,

18   because it's using "proceeds" there just to distinguish proceeds

19   as cash from the in-kind partition.  And you'll see this is in

20   more detail in the next slide.

21           So other courts have simply used that term "proceeds"

22   to contrast with in-kind balancing, and these courts aren't

23   referencing gross versus net.  They're not referencing the

24   ability of the unit operator to charge for post-production costs.

25   All they're doing is saying, hey, proceeds is different from

1    production in kind.

2          You can see this very clearly in the *Amoco v. Thompson*

3    case.  The Court says, "It is significant that this statute

4    defines the owner as the person who has the right to the

5    production and not just the proceeds from the sale of

6    production."  It's the exact language here, right?  It's the

7    exact language of 10(A)(3)), and it's just saying it's different

8    from production.  "The pertinent statutes, when read in pari

9    materia, refer to the owner's right to a share of the production,

10   not the proceeds of the sale of production."

11         THE COURT:  "In kind" is, gee, I'd like to take

12   wellhead gas and make use out of it in the volume that I would be

13   entitled to?

14         MS. DUARTE:  Yes, Your Honor.  It's taking it in kind.

15   It's saying, I'm going to market my own gas.  You don't sale it

16   for me.  I'm going to take it as gas, not as cash, after you've

17   gone and sold it for me.

18         THE COURT:  And is an unleased mineral owner entitled

19   to take in kind or are they restricted to proceeds?

20         MS. DUARTE:  They are entitled to take in kind.  And

21   that appears from -- let's see if I can find it.  Going back to

22   the text of 10(A)(3)).  "For which the party or parties entitled

23   to market production therefrom have not made arrangements to

24   separately dispose of the share of such production attributable

25   to such tract."

1       So that shows right there that only when they haven't

2  taken it in kind, when the UMO hasn't taken it in kind, does the

3  unit operator have the power to sell it and remit the proceeds

4  instead of the product, the production.

5       THE COURT:  Thank you.

6       MS. DUARTE:  Okay. So I went through *Amoco v. Thompson*

7  using it in that same production versus proceeds of sale of

8  production.  You see something similar in the *King vs. Strohe*

9  case.

10       In all of these, the emphasis is the courts, right?  In

11  this case the Court is saying -- let's see.  "The trade-off for

12  this statutory authorization is that it creates an obligation in

13  which the unit operator is required to pay the parties entitled

14  to market production their pro rata share of the proceeds of the

15  sale within 180 days.  The statute affords greater protection to

16  unleased owners than is enjoyed by mineral lessees.  When all

17  mineral interests in the unit are leased, the lessees are merely

18  entitled to a pro rata share of production from the unit.  This

19  share can be delivered in cash or in kind, but lessees are only

20  entitled to share in the cash proceeds of the sale of production

21  in certain situations."  So, again, the Court is using the term

22  "proceeds of the sale of production" or "proceeds just in cash"

23  just to show that it's not production.

24       And I will say this:  This is similar to something that

25  Your Honor said as well in the *Self* transcript.  And I'm looking

```
 1    at page 40 of the transcript.  And you said, "But that's the real
 2    gut case that I have, is how is 'proceeds' ambiguous?  'Proceeds'
 3    means 'proceeds,' neither net nor gross.  It just means 'that
 4    which you received at the time it was sold.'  And it's easy to
 5    find that."  And that's lines 13 through 16 on page 40.
 6             And again on page 42 on line 7, you're talking about
 7    proceeds, "that which I got from a sale."  That's exactly what
 8    we're saying here.  "Proceeds" is that which you got from a sale,
 9    money, cash.  It's not speaking to whether it's net or gross or
10    the amount of that that you're entitled to, but simply the fact
11    that it is cash.
12             And what I also wanted to point out is you see that
13    it's not just in the cases.  If we go up to 10(A)(2) -- 10(A)(3)
14    isn't the only time in 30:10 that the term "proceeds" is used.
15    The term "proceeds" also appears in 10(A)(2)(b)(iii), or however
16    you say that.  "A participating owner shall deliver to the owner
17    whom has not been notified the proceeds attributable to his
18    royalty and overriding royalty burdens as described in this
19    section."
20             Again, this is what we're talking about when the
21    drilling and production costs are being recouped before payout as
22    allowed under the statute.  The unit owner still has to remit the
23    amounts to pay the royalty owners and overriding royalty owners.
24             And the Court -- or the statute uses the term
25    "proceeds" here, too, but in this case "proceeds" doesn't speak
```

 1   to gross or net, right?  It says, "Proceeds attributable to his

 2   royalty and overriding royalty burdens."  To know whether it's

 3   gross or net, you would have to actually look at the royalties or

 4   the overriding royalties to see if they were cost-free or not.

 5   "Proceeds" just means cash.  It just means out of what you've

 6   sold, you've got to remit whatever amount is attributable to the

 7   royalty and overriding royalty burdens now.  And that's

 8   consistent with what we're talking about, what we're articulating

 9   here.  "10(A)(3) proceeds" also just means cash.  This is

10   consistent with what the Court seemed to be playing with in that

11   *Self* transcript quote I just gave you.

12           Okay.  So moving to the next step now.

13           Let's say you don't agree.  Let's say the Court doesn't

14   believe that "proceeds" just means cash and the Court gives it a

15   meaning of gross.  Even in that context, it is our position that

16   the 2297 right of reimbursement applies.  This is because

17   10(A)(3) doesn't relieve the UMO owner of other obligations that

18   can be applied against the amount received, right?  Even if you

19   get gross, there still may be other things that set it off

20   against that, and these other things may come from places other

21   than 10(A)(3) itself.

22           How do we know this?

23           Severance taxes.  And if I could like put fireworks

24   shooting out of this thing, if I knew how to do that, I would put

25   them on this slide, and I didn't ask my son to do that, but

```
1    severance taxes are the roadblock, right?
2              If we look at 47:635(2)(C), it says, "The unit operator
3    shall collect or withhold out of the value of the product severed
4    the proportionate parts of the total tax due by the responsible
5    owners."  And this applies to the UMO along with any other owner
6    under 47:632.
7              Now, plaintiffs have conceded -- I'm sorry?
8              THE COURT:  That's statutorily provided for.
9              MS. DUARTE:  Just like 2297.
10             THE COURT:  They're different in a different category.
11   They may be a post-production cost.  Severance taxes are actually
12   a production cost.
13             MS. DUARTE:  Well, I will quote, Your Honor, from
14   J. Fleet, right?
15             And in this case, "Post-production costs are those
16   costs and expenses incurred after the production has been
17   discovered and delivered to the surface of the earth.  Such
18   subsequent to production costs generally include those related to
19   taxes, transportation, processing, dehydration, treating,
20   compression, gathering," and Your Honor was basing that on Babin.
21             THE COURT:  Until it's severed, there is no production.
22   You've got to pull it out of the ground --
23             MS. DUARTE:  Right.
24             THE COURT:  -- in order for taxes to apply because you
25   don't tax reservoirs.
```

1              MS. DUARTE:  Exactly, which is why it's a

2    post-production cost.

3              THE COURT:  All right.  That's clear.

4              Thank you.

5              MS. DUARTE:  Okay.  So that being the case, in this

6    case the plaintiffs have conceded that they owed these severance

7    taxes and that the unit operator is authorized to withhold them

8    from its payment of proceeds to the UMO despite the express

9    language of 10(A)(3).

10             All right.  So we've gone to the next slide.

11             And my point here is simply that there's no logical

12   explanation for why severance taxes could be deducted from gross

13   proceeds, but the post-production costs that constitute necessary

14   and useful expenses under Civil Code Article 2297 can't similarly

15   be set off against it.

16             THE COURT:  The severance taxes are provided for by

17   specific statute.  Other components of post-production costs

18   don't enjoy statutorily-required deductions after production of

19   natural gas.

20             MS. DUARTE:  Article 2297 is just as much a positive

21   enactment of law as the severance tax provision.

22             THE COURT:  I disagree with you.  I can read "shall

23   withhold" or "shall or withhold" very clearly, but I don't see an

24   equivalent for transportation costs in unleased mineral owners.

25   I mean, that's a specific statutory required deduction after

1    production for everybody, whether you're a unitized, you know,

2    pulled in by a commissions unit or whether you're a mineral

3    lessor.  Severance taxes are paid because the state is going to

4    take its share out of what you remove underground.

5           Now, show me where there is a statutory authorization

6    of this specificity for post-production costs involving

7    transportation costs for an unleased mineral owner.

8           MS. DUARTE:  Article 2297 uses "bound" language, which

9    is the same thing as "shall."  It says, "The owner whose affair

10   has been managed is bound to reimburse the manager for all

11   necessary and useful expenses."  So if we're going to expect at

12   this stage that post-production costs are such necessary and

13   useful expenses, then 2297 is just as emphatic.

14          Now, I think the Court is going to -- or it sounds to

15   me like the Court is going to specific versus general, right, and

16   that's a rule of construction when you have a conflict.

17          THE COURT:  Right.

18          MS. DUARTE:  But only when you have a conflict.

19          And I would suggest that the severance tax statute is

20   not more specific than 10(A)(3).  10(A)(3) governs UMOs, and it

21   governs UMOs only in the situation in which their gas is sold by

22   a unit operator.  The severance tax statute applies not just to

23   the minerals.  It applies to anything that's been severed from

24   the ground or water, okay, trees, take your pick, lots of other

25   stuff, and it's not applying just to UMO owners, right?  It's

1    applying to anybody.

2          So that statute, I believe, is in exactly the same

3    position as 2297.  It has mandatory language that is owed.  It

4    applies to a broader group of people in a broader group of

5    circumstances.  So even if you got to the general versus

6    specific, the severance tax statute is not more specific than

7    10(A)(3).  So I think from an analytical standpoint, there is no

8    difference between the severance tax provision and the way that

9    it applies and Article 2297 and the way that it applies.

10         THE COURT:  Then you concede that 10(A)(3) is

11   unambiguous?

12         MS. DUARTE:  That is our position.

13         I think you get to the same place if you find that it

14   is ambiguous.  Our position is that it's unambiguous.  It just

15   means cash with respect to proceeds of the sale of production.

16   It doesn't speak to the issue of gross versus net.

17         But I'm playing devil's advocate here, and I'm saying

18   even if we go with the unambiguous means gross, then we still get

19   to the same place because we've got this duty to harmonize.

20   We've got another equally valid, equally situated, in terms of

21   stature, provision that we've got to harmonize with 10(A)(3)),

22   that this is how you do it for severance taxes.  It's the same

23   way for 2297.

24         And I guess I would add to that that this negotiorum

25   gestio right has existed since the code of 1870.  So it's not

1    something new, right?  It's been around for a long time before

2    10(A)(3) came along, before 30:10 came along, and the

3    legislature's presumed to know about it.

4            And I would also point out that this is an independent

5    obligation like the severance tax obligation owed by the UMO, and

6    it can be set off against the right to gross proceeds under the

7    Doctrine of Compensation, which is Civil Code Article 1983, and

8    that takes place by operation of law when two persons owe each

9    other sums of money.

10           So, again, just like severance taxes, there's nothing

11   inconsistent here about giving the UMO the right to gross

12   proceeds, if that's the way you construe the statute, and still

13   imposing upon it a separate obligation to reimburse the operator

14   for expenses.

15           Now, this is kind of the grand finale part, and here

16   what I want to point out to the Court and what I want to try to

17   convey is that our interpretation is the only one that harmonizes

18   the two statutes, the only one that avoids a conflict, right?

19   And it's also consistent with how both parties agree that the

20   severance taxes operate.

21           In addition to that, being consistent with those rules

22   of statutory interpretation, that primary rule that you must

23   harmonize, if you can, Chesapeake's interpretation is consistent

24   with the fact that like all working interest owners, UMOs are

25   required to pay their share of the cost of development and

1    operation of a well, right?  And it's also consistent with the

2    fact that other similarly-situated parties are required to pay

3    their share of expenses to share in the profit.  And in this case

4    I'm talking about mandataries, co-owners, good faith possessors.

5    This is that kind of undercurrent of unjust enrichment that

6    permeates the Civil Code, right?

7            In almost any case where someone is managing someone

8    else's interest, other than a bad faith possessor, you're going

9    to get your costs of management, your necessary and useful

10   expenses.  And I think that mandate is even the most interesting

11   one of these and here's why.

12           Louisiana recognizes passive mandate in addition to

13   express mandate, and a passive mandate is basically just when the

14   person whose stuff is being managed actually knows about it, but

15   doesn't do anything, that can give rise to a tacit mandate, and

16   when you have that tacit mandate, the mandate articles provide

17   that the mandatary gets his expenses of management.

18           So in this case we have negotiorum gestor, which

19   doesn't matter whether you know or not that your property is

20   being managed.  It's a fine line between that and the tacit

21   mandate relationship.  Yet the original opinion holds that

22   unleased mineral owners are different from the tacit mandate

23   situation, right, functionally, that they don't get it -- the

24   operator doesn't get it in the negotiorum gestio context, but it

25   does get it as to where we would end up if it's an actual

1    mandate.

2          So the point is that there is an absurdity, we believe,

3    in construing the statute 10(A)(3) in a way that distinguishes

4    the UMO so strongly from this giant history of reimbursement for

5    expenses that you see everywhere else in the code.

6          Now, the plaintiffs' interpretation, in contrast,

7    creates this conflict where we don't believe any needs to exist.

8    This violates this harmonizing rule of statutory interpretation.

9    It also treats post-production costs inconsistently with the way

10   severance taxes are handled.

11         And plaintiffs' interpretation makes these UMOs the

12   only people in Louisiana, besides bad faith -- besides people in

13   the bad faith possession context, to get this kind of a free ride

14   with respect to the expenses of managing the thing from which the

15   profit is derived.

16         This is another issue that the Court talked about in

17   its ruling in the *Self* transcript, and it's the last one that I

18   want to address.

19         There is no reason to treat UMOs differently in the

20   specific context of post-production costs.  That's our argument.

21         Courts have identified two instances in which the UMOs

22   do get right of protection.  They're not subject to a risk fee.

23   They're entitled to this in-cash balancing instead of this in

24   kind.

25         If we look at what the Fifth Circuit has talked about

1  in this *TDX Energy* case, we see that it's not enough to just say

2  that because unleased mineral owners get protection in some

3  situations, they should be entitled to that protection in all

4  situations.  You need to speciate it a little more.  It's

5  appropriate to look at why do they get protection in these

6  contexts and does that reasoning apply in the particular

7  situation you're looking at.

8  So in *TDX*, it was actually a situation where the Court

9  was considering whether the information statute, 30:103.1 and 2,

10  applies to all unleased owners, only ones who are totally

11  unleased, or those who are not leased to the operator, right?

12  And in doing that, the Court talked about, "The

13  district court thought that the legislature may well have

14  intended to provide greater protections for landowners who

15  typically are not as sophisticated as, or have the available

16  resources of, individuals or entities that procure mineral

17  leases.  Title 30 does provide some extra protection to

18  completely unleased owners.  They are not subject to a risk

19  charge.  That makes sense, as an unsophisticated owner may lack

20  resources to contribute to drilling costs up front, but there is

21  no apparent reason to treat lessees differently when it comes to

22  reports."  Right?

23  The Court is looking to the specific issue, the

24  reporting, and deciding do UMO owners have special protections

25  here or not.

1          Now, in this case they're doing that to say that

2     there's no special protection, so we're going to give the lessees

3     the benefit of this provision, but it's the same analysis that we

4     believe the Court needs to conduct here, right?

5          If we're going to talk about it's absurd for the

6     legislature to offer this additional protection to UMOs, this

7     basically free ride with respect to post-production costs, we

8     need to look at that specifically in order to -- we need to look

9     at the nature of the right, the nature of the free ride.  It

10    doesn't make any sense for UMOs to be treated differently in this

11    context, right?

12         The necessary and useful expenses reimbursement right

13    isn't dependent upon the sophistication of the person whose

14    affairs are being managed, right?  It applies to everybody.

15    Anyone that could be managed, this right applies.

16         So the fact that these UMO owners are protected from

17    the risk fee, are protected for the in cash because they don't

18    have the ability to market their own gas necessarily, doesn't

19    translate to the context of post-production costs.

20         THE COURT:  Let me ask you one question:  Is there any

21    instance in -- let's use fracking, for instance, with the

22    spidering and draining of gas from a unit area authorized by the

23    Commissioner of Conservation.  Under those circumstances, is it

24    possible for an unleased mineral owner to say I don't want to be

25    in the unit and you can't get natural gas from that horizon under

1    my property?

2              MS. DUARTE:  Well, I would assume the intention -- and

3    this is how I think it would work -- that the unleased mineral

4    owner, like anybody else, could contest the establishment of the

5    unit during that procedure, and if there's not special exception

6    made and the unit is established by the Commissioner, they're in

7    like everybody else.

8              THE COURT:  Right.

9              And they're forced into it.  And so the free ride,

10   they're automatically -- and no lease bonus was paid.  They don't

11   negotiate a royalty, whether it's one-eighth, 25 percent,

12   whatever.  The Haynesville Shale changed a lot of that.

13             So they're in because of the Commissioner's order

14   unitizing production from defined properties in the unit.  They

15   don't have any say in anything except with respect to the

16   assessment of costs or the -- I'm going to use this word

17   advisedly -- wrongful, you know, quote, end quote, assessment of

18   costs.

19             So their obligations are substantially less than a

20   mineral lessor's obligations and their rights are quite different

21   because they're not defined by the lease agreement and/or

22   operation of law.  They're just defined in their relationship

23   with the operator of the well essentially by default.  There is

24   no contract.  That's why it has to be quasi-contract because some

25   sort of relationship exists because the operator owes money, but

1    it is a default relationship over which they have no control.

2         MS. DUARTE:  Well, I'm not sure I understand the

3    default part of it because it's not default.  It's by operation

4    of law, which is one of the ways, under Civil Code Article 1757

5    or seventeen something seven that I cited earlier, is a source,

6    right, of obligations.  So it is an express contract provided by

7    law.

8         You are correct to the extent that they do not

9    negotiate it, right, that they -- but that doesn't mean that

10   they're in a worse position necessarily in terms of

11   post-production costs.  There's an upside and a downside.  It's a

12   risk that you don't know going in.  They are -- an unleased

13   mineral owner doesn't have to participate in the drilling costs

14   or anything like that on the front end, right?  They don't have

15   to put up any money.  So they can sit there and wait, and if

16   production doesn't -- if the well doesn't pay out, they never pay

17   in.  So there's no risk from that.  Even if the well does pay

18   out, they don't have to pay a risk charge from sitting it out.

19   So they get to wait for that whole process.  They have rights to

20   information along the way for the pre-production costs that have

21   consequences if that isn't complied with, and those kinds of

22   claims are made in this case as well.  They're totally distinct

23   from this, but they're made.  So they have those rights.

24        They have a preference over the other working interest

25   owners in that they get in-cash balancing if they want.  Now,

1    they can still take it in kind, right?  So they can do their own
2    thing if they're sophisticated and they want to do it, but if
3    they don't, they get cash.  Nobody else gets that unless some
4    special situation applies.  So it's not all against them, right?
5    They are brought in by force just like others are brought in by
6    force even if they're leased.  You know, you can get stuck with
7    Operator X that's not your lessee.  There are a lot of forced
8    aspects of it that are not unique to the UMO.
9            And the whole force regime is, of course, designed to
10   prevent waste, right?  It's not to just try to stick it to people
11   like the UMOs.  It's to try to have a meaningful way to develop
12   the resources of the state and ensure that everybody gets their
13   just and equitable share.
14           THE COURT:  So I guess the question I'm asking you is:
15   Are unleased mineral owners, vis-a-vis the operator of the well,
16   in an inferior position to those who have leased their land to
17   the original mineral lessor?
18           MS. DUARTE:  No.
19           In some manners they are in a preferential position
20   like the in cash versus in kind, and economically you can't tell
21   until the end of that process who's in a better position, who
22   made a better bet by leasing or not leasing.  It depends upon the
23   provisions of the lease, and it depends upon the payout of the
24   well.
25           It may be that somebody in the end who decides not to

```
1   lease makes more money with that working interest that they get
2   paid on once the well pays out as opposed to having leased for
3   certain terms.  It's absolutely not a situation in which the UMO
4   always comes out less than the leased party.
5               THE COURT:  All right.  Thank you.
6               MS. DUARTE:  Unless the Court has any other questions,
7   that's the end of my presentation.
8               THE COURT:  I don't have any questions, but I do want
9   to take a ten-minute break before we hear from Drew Martin.
10              And thank you for a very well put together presentation
11  that really illustrates very clearly the issues here and your
12  argument that's contained in your brief.
13              MS. DUARTE:  Thank you, Your Honor.
14              THE COURT:  We'll be in recess until about 11:20, and
15  at that time we'll hear the response or rebuttal argument of
16  Mr. Martin on this on behalf of the plaintiffs.
17              Thank you.
18                        (RECESS)
19              THE COURT:  All right.  We're back on the record.
20              Is everybody that needs to be present on Zoom there?
21              MR. MARTIN:  Yes, Your Honor.
22              THE COURT:  All right.  Let's see.
23              Drew Martin.
24              MR. MARTIN:  Yes, Your Honor.
25              THE COURT:  I'm going to put you heads-up on my screen
```

1    so that I can clearly see you and you'll be ready to go.

2              MR. MARTIN:  Yes, sir.

3              I'm going to share the screen here real quick, get my

4    PowerPoint up and running.

5              THE COURT:  I need you to send it to my chambers

6    afterwards.

7              MR. MARTIN:  Yes, Your Honor.

8              Can everyone hear me okay?

9              THE COURT:  The Court can.

10             MR. MARTIN:  Thank you, Your Honor.

11             Good morning.

12             I'm sure the Court's tired of hearing us reiterate our

13   position over and over again in these related matters, but I'm

14   going to jump in and do it one more time for the Court, weigh out

15   what our argument actually is.  It's pretty simple.  It's that

16   the enactment of 30:10 in 1984 and went into effect in 1985

17   created an obligation that did not previously exist.  For the

18   first time an operator was obligated to pay one class of owners

19   within a unit their prorated share of the proceeds of the sale of

20   production.

21             The next step of this argument is that this Court's

22   institutional function is to construe the nature of that

23   obligation, figure out what its content is rather than trying to

24   determine what the content should be.

25             Opposing counsel mentioned that she does not think

1   there's any logical explanation for how the legislature elected

2   to deal with this.  That's a policy argument that should be

3   addressed with the legislature.

4          The next step is the ordinary public meaning of the

5   words of Section (A)(3) are what we give effect to in construing

6   the content of the obligation.

7          And then, finally, proceeds of sale has an unambiguous

8   ordinary public meaning.  It means the entire amounts.

9          You'll see the many cases we've cited to that effect,

10  that the unmodified form of those phrases refers to everything.

11  The *Phillips Petroleum*, the *Garland v. Roy* case.  This is both in

12  the oil and gas context, outside of the oil and gas context,

13  within the Fifth Circuit and across the country.

14          "Proceeds" means proceeds.  It really is that simple as

15  you put it in the *Self* hearing.

16          So that's our position, and I really do think that's

17  the end of the story.  That's, I think, what this Court

18  determined in March of 2019 when the Court ruled that it need not

19  reach any of Chesapeake's many arguments because the legislature

20  provided a solution to this exact question exactly where it looks

21  like it did.  The law is what it appears to be.  And this is not

22  an elaborate, postmodern prank played by the legislature to hide

23  the ball, intentional obscurity.  That's not what's going on.

24          So I don't think we need to go further than the statute

25  that is the only statute in Louisiana that directly addresses

1    what an unleased owner is to be paid, but because I'm opposing

2    Chesapeake's motion, I do feel obligated to at least give an

3    overview of their arguments.

4            So what is Chesapeake's position?

5            Now, opposing counsel primarily detailed gestio law,

6    which is what I've got listed first, and there is no question

7    that that appears to now play an important role in their suite of

8    arguments at this point, but when you look at what's still on the

9    table in this reconsideration, that's just the tip of the

10   iceberg.

11           They've also argued unjust enrichment, mandate.

12   Chesapeake has argued that the co-ownership theory gives them the

13   result they want.

14           They've made a number of equity and policy arguments,

15   some of which opposing counsel touched on.

16           They've argued legislative intent, and this is an

17   interesting one because Chesapeake took the bold step of trying

18   to enlarge the summary judgment record after the fact on

19   reconsideration in adding in evidence it claimed was evidence of

20   legislative intent, and that was a big part of the motion for

21   reconsideration addressed in the reply.  It seemed to be kind of

22   central to answering the question to Chesapeake and yet opposing

23   counsel didn't even mention it in her oral argument.  It shrunk

24   in importance all of a sudden.

25           Chesapeake has argued that Section (A)(3) is only about

1   timing about when an unleased owner is to be paid.  Chesapeake

2   has argued that industry custom gives them the result they'd

3   like.

4          Chesapeake has argued that post-production expenses are

5   operating costs and that post-production expenses are not

6   operating costs.

7          Chesapeake has argued that the plain language of

8   Section (A)(3) produces an absurd result and that it does not.

9          Chesapeake has argued that the statute is ambiguous,

10  and Chesapeake has argued that the statute is unambiguous, back

11  to back pages in fact.

12         And then opposing counsel -- and I'm glad she did this

13  -- brought up a third way, what I'd call the agnostic position,

14  which is that it doesn't matter if the statute is unambiguous.

15  The rules of gestor -- every rule of gestor applies if not

16  expressly excluded within 30:10.  And I'm glad she brought that

17  up because it does kind of summarize Chesapeake's entire flexible

18  approach to statutory interpretation.  It doesn't matter what the

19  statute says.

20         I would contrast this with *BPX's* original argument in

21  the *Self* matter, which there were certainly many problems with an

22  ambiguity argument, but *BPX* at least seemed to concede that if

23  the statute had said "gross proceeds," that would have been

24  enough to knock out those production expenses.  Chesapeake's

25  position is, no, it doesn't matter what Section (A)(3) says.

1   There's no way to knock out post-production expenses except

2   presumably a statement that Article 2297 of the Civil Code, which

3   is not referenced anywhere else in the unitization statute, still

4   does not apply in this context.  That appears to be the only

5   thing that would satisfy Chesapeake at this point.

6           And I would note that *BPX* appears to have updated its

7   position after the *Self* hearing to something akin to this

8   argument perhaps when they realized there were some problems with

9   the ambiguity argument, but I'm just using it to contrast what

10  Chesapeake is saying with what at least *BPX* used to say.

11          Now, this is a lot of arguments, and it's kind of --

12  Chesapeake's arguments here are kind of like Walt Whitman.  They

13  contain multitudes, right, and you could spend a lot of time

14  trying to parse out how these play into each other.

15          How does gestio law interact with ambiguity interact

16  with absurdity?  Which of these are compatible or incompatible?

17  Which of these are independent justifications or dependent ones?

18          We could spend a lot of time doing that.

19          We played whack-a-mole in briefing a lot and I think

20  we've done a fair job at knocking out each argument on its own,

21  but this Court was faced with many of these arguments at the

22  original summary judgment stage and I think made the correct

23  determination that you don't need to wade into that swamp of

24  arguments and try to figure out how they fit in with each other

25  unless you're willing to step away from the only statute in

1    Louisiana that addresses payment to an unleased owner.

2          And when you look at a set of arguments this wide, it's

3    hard not to come away with feeling that Chesapeake's treating

4    this with a bit of cynicism.  Chesapeake is arguing the statute

5    is ambiguous and unambiguous and it doesn't matter, but what

6    they're really doing is they're winking and nodding and saying,

7    Your Honor, please give us the result we want by any means you

8    find acceptable.  And that's fine.  Chesapeake's lawyers' job is

9    to come up with arguments that deliver the result their client

10   wants, and they have elected here, as a strategic matter, to take

11   the shotgun blast approach, to take the everything thrown at the

12   wall and see what sticks approach, and that's their tactical

13   prerogative.  I'm not criticizing that, but what that should tell

14   you is that this is just about the result.

15         There's no theoretical consistency here because

16   theoretical consistency is not the point.  The point is to

17   backwards engineer a rationalization for a practice that began

18   over a decade ago before these arguments were dreamed up.  This

19   was not the prospective justification.  As this Court recognized

20   on summary judgment, you don't need to go there.  You do not need

21   to step away from the statute which appears to address this exact

22   question.

23         And I'd turn now to what I think is kind of an elephant

24   in the room when it comes to gestio theory, which is the

25   centerpiece for opposing counsel's argument today.

1          As I was going through all the briefing in this matter
2     and the related matters in preparation for this hearing, a
3     statement jumped out at me from the amicus brief filed by LABI,
4     and you see the same statement in, I think, the 12(b)(6) motion
5     in the related class action.  Both of these documents were
6     authored by current counsel for Chesapeake, Ms. Duarte.

7          And in it she says that for the past 25 years, it has
8     been settled in Louisiana that this is negotiorum gestio.  It's
9     quasi-contractual in nature based upon the doctrine of negotiorum
10    gestio set forth in Civil Code Articles 2292, et seq.  However,
11    this Court's ruling does not mention this settled body of state
12    law establishing Section (A)(3)'s quasi-contractual negotiorum
13    gestio foundation.  The bold is in the original.  The message is
14    shouted.  It's how did you miss this, Your Honor?  This isn't
15    just the correct answer.  This is settled law.  This is obvious.
16    But that statement looks pretty curious when you look at the
17    timeline of this case.

18         This suit was filed in October of 2016.  I know this
19    because I drafted the petition.  Chesapeake removed it to this
20    Court shortly thereafter and then filed a motion for summary
21    judgment in February of 2018.  Chesapeake then filed a reply
22    memorandum in support of that MSJ in March.  Then we all got
23    together on May 8th of 2018, and Mr. Summers from my firm
24    argued for plaintiffs and Mr. Ottinger for Chesapeake.  And in
25    this time period many, many arguments were advanced by

1    Chesapeake.  Most of the arguments on that long list I gave had

2    already been advanced.  And then on March 21st, 2019, this

3    Court issued its summary judgment ruling.

4            Now, you can scour every document filed before that

5    point and pour over the transcript of the oral argument and

6    you'll find nary a mention of gestio law.  The law that

7    Chesapeake now says is settled, obvious, how did you miss it,

8    Judge, Chesapeake did not articulate for two years, six months,

9    and 22 days.  What could explain -- what's that, Your Honor?

10           THE COURT:  That's accurate.

11           MR. MARTIN:  What could explain a delay of this

12   magnitude for an obvious settled point of law?

13           One answer is Chesapeake just didn't want to put forth

14   this argument.  And we'll get to that.  An implausible answer, I

15   think, is that Professor Ottinger and his team just didn't think

16   of it.

17           I've known Professor Ottinger for a very long time.

18   I've worked against his team.  And just like opposing counsel

19   today, they are all exceptionally keen people.  They are

20   penetrating thinkers in the oil and goes context.  I don't think

21   this simply escaped them as a possibility.

22           So I think the first correct answer of why did this

23   take so long is they didn't think it was a good theory.  They

24   didn't think it applied.  And there's very good reason for that

25   judgment.  There's a management of affairs when someone acts

1  without authority, without having been charged to do so and not

2  pursuant to a legal duty.

3          Now, Chesapeake has authority to act in this regard.

4  It has statutory authority through the unitization statutes and

5  it has executive authority by way of unit orders.  Chesapeake is,

6  in paying an unleased owner, acting pursuant to a legal duty.

7  It's not a perfect fit.  And there's very good reason to think

8  that the whole suite of rights and obligations from gestor law

9  cannot be imported here.  It just doesn't make sense because of

10  the differences.

11          Now, opposing counsel got into quasi-contract, and we

12  have never disputed that what's going on here is

13  quasi-contractual in nature for exactly the reasons she put

14  forward and I think you noted as well.  It has to be because

15  there's no contract.

16          In Civil Code Article 1757, there's only two sources of

17  obligations, contract and quasi-contract.  Since we all agree

18  there's no contract, it must be quasi-contract.  And no question

19  some courts have said insofar as the operator does this, it's

20  kind of like negotiorum gestio, but that's not reason to think

21  that every piece of gestio law is imported into the unitization

22  statutes.

23          And that brings me to my second answer of why

24  Chesapeake delayed so long in advancing its obvious settled

25  theory of law.  It's that Chesapeake understood that advancing

gestio would be jumping out of the frying pan and into the fire. They did not want the whole suite of rights and obligations from the gestor articles to be imported into the unitization statutes. They did not want that because that held many negative consequences that perhaps some of the other theories did not hold.

And I may just focus on the first one of these, but a gestor owes a fiduciary duty to the managed party. So if Chesapeake, in February of 2018, said we're gestors, then automatically Chesapeake becomes a fiduciary to every unleased owner in a Chesapeake-operated unit in this state and it did not want to take on the additional liability entailed by that duty. As but one example, Chesapeake, in acting as a fiduciary, would have a duty of candor and scrupulous fair dealing with unleased owners.

Now, as we know, Chesapeake intentionally concealed the existence of post-production deductions from unleased owners. It did not provide these deductions on the quarterly statements sent to unleased owners and it only began doing so after this Court issued its ruling in March of 2019. It got caught with its hand in the cookie jar.

Chesapeake knew it couldn't meet a duty of candor, of fair dealing, because it had concealed so much of this. Chesapeake did not want to take on the additional liability in 2018 of being on the hook for breach of fiduciary duty and all

1   the damages that might entail.  So they held it in their back

2   pocket until you rejected every other theory they advanced and

3   they had to come up with something new.  They made a calculated

4   --

5           THE COURT:  Mr. Martin, let me interrupt you.

6           MR. MARTIN:  Yes, sir.

7           THE COURT:  One of the requests in the opposition brief

8   filed on behalf of the plaintiffs contemplated the what if the

9   Court reconsidered and agreed gestor law applied.  Then if I

10  granted leave to amend, what do you think your amendment would

11  look like?  Am I beginning to hear one allegation or the other of

12  the failure of Chesapeake to comply with its fiduciary duties to

13  unleased mineral owners?

14          MR. MARTIN:  Yes, Your Honor.  That's exactly it.

15          This is if you adopt their theory, this is what

16  happens, these are the consequences, and those consequences are

17  exactly why Chesapeake did not advance the argument earlier, but

18  when you ruled against all the other arguments, they made the

19  calculated risk of let's advance it now knowing it would look

20  pretty insincere if we've waited two and a half plus years to

21  advance it knowing that it held all of these negative

22  consequences because it thought that it could maybe push those

23  off down the road.  They had to jump out of the frying pan.  They

24  may land in the fire, but they'll figure out how to get out of

25  the fire later because Chesapeake -- there's many attorneys on

1   this hearing that represent operators.  None of them want an

2   operator to be on the hook for a breach of a fiduciary duty to

3   unleased owners.  None of them wants a gestor, an operator, to

4   have to wait for the directions from every unleased owner in

5   Louisiana.  None of them want the duty to be acting solely on the

6   behalf of unleased owners in dealing with their share of

7   production because then they're not a gestor if they act contrary

8   in any way.  This is in contrast to what you see in a lease

9   context where the lessee, under a lease, only has to act for the

10  mutual benefit of the two parties, the lessor and the lessee.  It

11  can balance.

12          But there's no mutual benefit here.  There's no

13  balancing contemplated in gestor, period.  And a party is not a

14  gestor, and, thus, would not be entitled to all of the provisions

15  of 2292, et seq., if it failed to act as a gestor.  It becomes a

16  messy fact question.  Chesapeake did not want, in February of

17  2018, to be liable for mismanagement of the affairs of unleased

18  owners.

19          Chesapeake, as we all know, is in bankruptcy right now

20  because it mismanaged its own affairs.  What chance does it have

21  of escaping mismanagement of unleased owners' affairs whose fates

22  are kind of tied to Chesapeake's ability to make good decisions?

23          And then finally -- and I think this is a big one -- a

24  gestor owes the managed party a proportionate share of profits

25  obtained by way of management.  Chesapeake in 2018 was aware of

1   this.  They knew this was encompassed by the gestor theory and

2   didn't want to advance it because they did not want to have to

3   share all of the profits in a proportionate amount with unleased

4   owners across Louisiana.

5        And to the extent Chesapeake is going to argue against

6   this, I expect what they're going to say is don't worry about

7   this right now, Your Honor.  Don't even think about it.  It's as

8   we said in the *Self* matter, don't pay any attention to the man

9   behind the green curtain.  Worry about it later when it's before

10   you when they do amend.  But they are asking you to consider all

11   the consequences of ruling a certain way here, so it seems to be

12   on the table.

13        If you rule the way Chesapeake is asking you to rule,

14   you're going to be tasked with being the philosopher king who has

15   to decide how all of these play out in the unleased owner and

16   operator context.  I have no doubt that you could be a very

17   capable philosopher king, but that's not the Court's

18   institutional role.  The Court's institutional role is to apply

19   the law.

20        I end with something that came up in the same amicus

21   brief that I referenced earlier and in the 12(b)(6) motion in the

22   class action, and it's this:  Chesapeake in both documents says

23   -- or Chesapeake's counsel says that this Court turned Louisiana

24   law on its head in March of 2019 when it ruled that the law is

25   what it looks like it is.  That's a pretty hyperbolic statement

1    it seems.  So I'll answer it with my own hyperbole, which is

2    this:  Chesapeake's argument turns the very notion of law on its

3    head.  The most basic function of written law is to tell the

4    citizens subject to that law what their rights and obligations

5    are.

6         Chesapeake's contention right now really is 30:10(A)(3)

7    does not tell an unleased owner anything, that because there's

8    not an express exclusion of Article 2297 within Section (A)(3),

9    it applies, and you should have known this, guys.  All you

10   unleased owners out there, you should have been pouring over your

11   Civil Code.  Yes.  It did take Chesapeake two and a half years to

12   mention it, but you guys should have known it, and that just

13   strikes me as extraordinarily implausible.

14        And what comes next after all of this is if you adopt

15   the gestor theory and you have to parse through all of this

16   stuff, Chesapeake is going to switch from having this very

17   flexible view of statutory interpretation to being Justice

18   Scalia.  Well, the text doesn't say we have to share profits.

19   Yeah.  But there's no express exclusion either.  And that's the

20   standard Chesapeake's counsel just told you, that all of these

21   rules are applicable unless expressly excluded, and we don't have

22   that here.

23        And so we can already foresee what happens in the next

24   stage, and that's why I'm saying that if opposing counsel has

25   rebuttal, she'll probably tell you to punt.  Don't worry about

1    that right now, Your Honor.  But if that is the case, if all of

2    these other rules do apply by default except where expressly

3    excluded, that's on the table.

4         So Chesapeake's argument is that the one statute in

5    Louisiana that appears to address this question does no such

6    thing.  It's, as I said, an elaborate postmodern prank and the

7    real law is somewhere else.  (A)(3) is a red herring.  The real

8    law is someplace else and Chesapeake will find it for you.

9    Chesapeake's argument is the law is not what it says it is.  It's

10   what Chesapeake says it is.

11        And in support of this claim, what Chesapeake has

12   offered you is this tangled knot of arguments that, again, you

13   could take many, many hours trying to disentangle and figure out

14   what's actually still being argued, but what I think this Court

15   saw in March of 2019 is what Alexander saw when he came upon the

16   Gordian knot, which is you don't try to untie the knot.  You cut

17   the rope before the knot.  I believe that's what this Court did

18   in 2019.  That's what we're asking this Court to do again today.

19        Chesapeake has offered a number of arguments, some old,

20   some new.  Maybe there's more on the horizon.  This Court

21   determined you don't need to take the first step away.  You do

22   not need to consider all of these other areas of law if

23   "proceeds" means proceeds.

24        THE COURT:  So turning Louisiana law on its head, is

25   that the effect of adopting the negotiorum gestor theory by

 1   suddenly holding all well operators to be fiduciaries with

 2   respect to unleased mineral owners?

 3           MR. MARTIN:  That would seem to turn Louisiana law on

 4   its head.  And I suspect if we amend it to say you've breached

 5   your fiduciary duty, they will immediately reply there is no

 6   fiduciary duty.  They're going to shift in between being strict

 7   textualists to be look at everything, Your Honor.  Look at the

 8   wider context.  It's just a game to get a result.

 9           It's like I said earlier.  There's no theoretical

10   consistency, but this theoretical consistency is not the point.

11   The point is to get out of the fire right now -- or out of the

12   frying pan, get into the fire, and then figure it out later.

13           THE COURT:  But the net effect by operation of law

14   under the Civil Code for that kind of quasi-contractual

15   relationship converts it from an ordinary type of duty to an

16   extraordinary management duty?

17           MR. MARTIN:  Yes, Your Honor.

18           And I think that explains why they didn't advance the

19   argument earlier, that they did not want to take on extraordinary

20   duties.  They wanted it to be a pretty simple,

21   statutorily-created relationship, but, again, I think they were

22   left with no other choice but to throw all their cards on the

23   table after the summary judgment ruling, which is why they

24   waited.

25           THE COURT:  All right.  Anything further?

```
1              MR. MARTIN:  I have nothing further, Your Honor.

2              THE COURT:  All right.  Ms. Duarte.

3              MS. DUARTE:  I'll be very quick.

4         So I offered the Court a very streamlined, very direct

5    roadmap of Chesapeake's position and how the law requires this

6    Court to go on a step-by-step basis in making its decision, and

7    what you were just offered by plaintiffs' counsel was an attack

8    on Chesapeake, an attack on Chesapeake's lawyers.  There were

9    some conspiracy theories in there on why this argument didn't

10   come in before.  There was a bunch of totally irrelevant stuff

11   that's not before the Court at this stage.  And what you didn't

12   hear was any attempt to talk about the actual issues, to talk

13   about the rules --

14             THE COURT:  Let me stop you right there.

15             MS. DUARTE:  Okay.

16             THE COURT:  Suppose in footnote 1, if I accept the

17   negotiorum gestor theory and hold that the operator is in fact

18   part of that, then am I dropping a footnote that says under the

19   Civil Code, the duties of an NG become that of a fiduciary,

20   period?

21             MS. DUARTE:  No.  I don't think you are, and that's not

22   an issue that's before you right now.

23        The statute that we have given the Court as providing

24   for the right of reimbursement gives the standard of care for the

25   negotiorum gestor as well.  The manager is then taken as a
```

```
1    prudent administrator.  Okay?  We'll have to talk about what that
2    is and what it means, but it doesn't mean you're opening --
3              THE COURT:  A negotiorum gestor set of duties now is
4    different in the oil and gas operator context than in the Civil
5    Code context?
6              MS. DUARTE:  I'm not saying that.  I'm saying I gave
7    you the article from the Civil Code.  The prudent administrator
8    standard would apply.  So I'm saying that it does apply.
9              THE COURT:  Why doesn't fiduciary duty provided by the
10   Civil Code apply?
11             MS. DUARTE:  I'm sorry.  I didn't hear that, Your
12   Honor.
13             THE COURT:  Why does not the fiduciary duty in the
14   Civil Code for a gestor apply?
15             MS. DUARTE:  Because the word "fiduciary" doesn't
16   appear in the Civil Code, Your Honor.  The words "prudent
17   administrator" does.  The word "fiduciary" comes from Mr. Martin.
18   I haven't read the cases that he cited exactly to be able to
19   distinguish them, but it's not in the Civil Code.
20             And I will tell you this, another thing.  He mentioned
21   Article 2294 saying that the manager must wait for the directions
22   of the owner.  Also not true.  If you actually look at Article
23   2294, it says the manager is bound, when the circumstances so
24   warrant, to give notice to the owner that he's undertaken the
25   management and to wait for the directions unless there's
```

1    immediate danger.

2            Here the unleased mineral owner is getting noticed

3    every time he gets a check that its interests are being managed,

4    okay, and the circumstances so warrant.  It doesn't say that in

5    every case we have to wait for their direction.  So I totally

6    disagree with the enumerated items applicable to the duties that

7    would be ours as a negotiorum gestor, but he's right when he says

8    that that's not for the Court right now.  We are not saying that

9    the only negotiorum gestor duty that applies is the right of

10   reimbursement.  We're not saying that.  Okay?  In the same

11   statute it talks about prudent administrator.  We're with you on

12   that.  We're not saying it's different in the oil and gas

13   context, but the point that I think the Court needs to hold them

14   to is they didn't address the legal analysis to get there at all.

15   Okay?

16           I put up fireworks around "severance taxes."

17   Fireworks.  I said roadblock.  How do you get around this?  How

18   can analytically you say that severance taxes be deducted, but

19   these can't?  And there were crickets.  The words "severance tax"

20   didn't come up at all in the argument.

21           Now, I never once meant to attack the Court for not

22   finding negotiorum gestio.  It would have been much better if it

23   had been raised earlier.  That's not the Court's fault, but the

24   Fifth Circuit isn't going to care whether it was two years or two

25   minutes after this case was instituted that this theory was

1    articulated if it's the right theory, if it's the right answer

2    when you apply the rules of statutory construction correctly in

3    the order they're supposed to be applied.  They did not offer you

4    anything to refute what we went through painstakingly in our

5    argument.

6          So in that respect, I think we're no further along than

7    where we were when I stopped the first time.  We've offered you

8    the roadmap.  They haven't refuted the roadmap.  So I can't even

9    talk about anything else on that since I've already addressed

10   everything and there's nothing to counter to that.

11         You're not turning Louisiana law on its head if you

12   adopt negotiorum gestio.  You're following the Supreme Court's

13   decision in *Wells vs. Zadeck*.  You're following the First Circuit

14   and the Third Circuit in the *Taylor* cases.  Okay?  This is only

15   saying that that doesn't apply simply in a prescription context.

16   That's all you're doing that's new.  And Judge Foote's already

17   done that in *J&L*.  So this is not some great new thing.  It will

18   be a big difference if what you're saying is negotiorum gestors

19   are the only category of folks in Louisiana law that don't get

20   reimbursement for their management expenses.

21         Unless the Court has any other questions, I don't have

22   anything else.

23         THE COURT:  I do not.  I may set some additional

24   briefing requirements following today and we will notify everyone

25   in due course.

1          I want to thank everybody for being so well-prepared

2    and for actually finishing this before lunch.  I'm stunned.  But

3    it's complex and it's an important question.

4          The matter has been moved for reconsideration by the

5    Court with a whole bunch of additional stuff added to it, and we

6    will thread through that and see if it's intertwined or separate

7    from and what to be done with it.

8          Great arguments presented by both sides and stay tuned

9    for that briefing schedule.

10          MR. MARTIN:  Thank you, Your Honor.

11          MS. DUARTE:  Thank you, Your Honor.

12          THE COURT:  Thank you.

13          Ms. Duarte, may I ask you a quick question?

14          MS. DUARTE:  I'm kind of scared, but, yes, sir.

15          THE COURT:  Is that a radiant steam heater system under

16    the window where you are?

17          MS. DUARTE:  It's actually a virtual background.  You

18    don't want to know what's behind me in the room that I'm actually

19    in, Your Honor.

20          THE COURT:  I was curious because, boy, that's a heck

21    of a deal to leave a steam radiant heater.  You don't want to see

22    my background either.  I just look like I'm in the courtroom.

23    The Grand Jury is occupying it today.

24          MS. DUARTE:  You do.

25          THE COURT:  But we have the visual imagery of that

1    which we choose on this Zoom platform.

2              Thank you, everyone.

3              You look like you're in a real room with books behind

4    you.

5              MR. MARTIN:  I was going to say Ms. Duarte has been

6    knocking her own ability with technology.  This is just our

7    conference room.  I don't know how to make a virtual background.

8    I'm not sure what I'm doing wrong.

9              THE COURT:  Yeah.  You've got to have a 12-year-old or

10   a network engineer.  That's all there is to it.

11             Thank you, again.  Bye-bye, everyone.

12             MR. MARTIN:  Thank you, Your Honor.

13             MS. DUARTE:  Thank you.  Bye-bye.

14                       (Proceedings adjourned.)

15                          —   —   —

16

17

18

19

20

21

22

23

24

25

1                           Certificate

2     I hereby certify this 5th day of August, 2021, that the foregoing

3     is, to the best of my ability and understanding, a true and

4     correct transcript from the record of proceedings in the

5     above-entitled matter.

6

7                               _/s/ LaRae E. Bourque_

8                               Federal Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25