# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# SHREVEPORT DIVISION

| | |
|---|---|
| ALLEN JOHNSON, ET AL. | CIVIL ACTION NO. 16-1543 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| CHESAPEAKE LOUISIANA, LP | MAGISTRATE JUDGE HORNSBY |

## MEMORANDUM RULING

Before the Court is a Motion for Reconsideration (Record Document 68) filed by Defendants, Chesapeake Louisiana, L.P. and Chesapeake Operating, L.L.C. (collectively "the Chesapeake Defendants"). The Chesapeake Defendants seek reconsideration of this Court's March 2019 pronouncement that pursuant to La. R.S. 30:10(A)(3), an unleased mineral owner ("UMO") is not subject to bearing its proportionate share of post-production costs. See id. The Chesapeake Defendants point to the doctrine of *negotiorum gestio* – an argument previously not presented to the Court – as the mechanism for the operator to recover post-production costs from UMOs. See Record Document 68-1.[1] Plaintiffs Allen Johnson, Linda Johnson, Donald A. Crosslin, Jr., Mary Jo Gragg, Rodney M. Hudson, Clifton Layman, Alfred R. Meshell, Sherman R. Meshell, David E. Oliver, Tracy Oliver, Laura S. Pendleton, Andrew L. Piccolo, Karla S. Piccolo, Randall S. Rodgers, Freddie P. Spohrer, Tim G. Taylor, Charles R. Waldon, Rexford Galen White, James Shope, Donna Shope, Charlotte McCune, and Jerry McCune oppose the Motion for Reconsideration (hereinafter "Plaintiffs" or "UMO Plaintiffs"). See Record

---

[1] In their motion, the Chesapeake Defendants also cite the law of mandate, the law of co-ownership, the law of unjust enrichment, and fundamental property law as additional grounds for reconsideration. See Record Document 68. The Court has decided the instant motion solely on the grounds of *negotiorum gestio* and does not reach the Chesapeake Defendants' other stated grounds.

Document 85.  Amici curiae briefs are also before the Court.  See Record Documents 104, 106, and 108.  The amici curiae briefs were filed by the Louisiana Association of Business and Industry, the Haynesville Shale Operator Group, and the Louisiana Mid-Continent Oil and Gas Association and the Louisiana Oil & Gas Association.  See id.  All amici curiae briefs support reconsideration of the Court's prior ruling and the position of the Chesapeake Defendants.  See id.  For the reasons set forth below, the Motion for Reconsideration is **GRANTED** and the Court now holds that the doctrine of *negotiorum gestio* – as set forth in Louisiana Civil Code Article 2292, *et seq.* – governs the quasi-contractual relationship between an operator and UMO, thereby providing the mechanism for reimbursement of post-production costs incurred by an operator to market the UMO's gas.

## BACKGROUND

The Chesapeake Defendants were at all times relevant the operator of the Kelley Well, which is the unit well of the HA RA SU86 unit ("the Unit").  The UMO Plaintiffs are landowners within the Unit and own a non-operating, unleased interest in the Unit.  In their Petition, the UMO Plaintiffs allege, among other claims, that the Chesapeake Defendants improperly deducted certain post-production costs from the UMO Plaintiffs' share of production proceeds.  In particular, Plaintiffs contend that the Chesapeake Defendants have violated Louisiana law by charging or netting-out post-production costs from Plaintiffs' share of production secured from the Kelley Well.  These post-production costs generally include gathering, compression, treatment, processing, transportation, and dehydration costs.

### I.   The Court's Previous Memorandum Ruling and Order (Record Documents 54 and 55)

The Chesapeake Defendants moved for partial summary judgment, alleging that their deductions for post-production costs are authorized under general principles of unjust enrichment and, alternatively, co-ownership. See Record Document 24. The Chesapeake Defendants argued that La R.S. 30:10 was inapplicable to the instant matter, as such statute is limited to development and operation costs and does not address post-production costs. The UMO Plaintiffs opposed the motion and filed their own cross-motion, arguing that general principles of co-ownership and unjust enrichment cannot supersede the positive statutory law governing their payment rights. See Record Document 28. They argued the statutory scheme set forth in La. R.S. 30:10 governs and that post-production costs were not among the exclusive list of expenses deductible against unleased owners.

The Court heard oral argument on the cross motions. See Record Document 50. In its ruling, the Court noted the *res nova* issue presented in the cross motions. See Record Document 54 at 6. The Court underscored the distinctions between unleased mineral owners and the nonoperating working interest owners that permeated Section 30:10. See id. at 6-7. Applying rules of statutory construction, the Court held that La. R.S. 30:10(A)(3) governed the instant dispute:

> Because the Legislature has provided a statutory scheme, this Court will not resort to equity or other principles of Louisiana law to modify or supplement the statute. Under Section 10(A)(3), post-production costs cannot be recovered by an operator from an unleased mineral owner's share of production proceeds.

Id. at 10. The Court discounted the Chesapeake Defendants' argument that Section 30:10(A)(3) was nothing more than a provision directing the time period within which

operators must pay the unleased owners, instead holding the statutory provision directed "both when an unleased mineral owner is to be paid and what he is to be paid – the payment of sales proceeds." Id. at 7-8. Accordingly, the UMO Plaintiffs' Cross-Motion for Partial Summary Judgment (Record Document 28) was granted and the Chesapeake Defendants' Motion for Partial Summary Judgment (Record Document 24) was denied. See id. The instant Motion for Reconsideration followed.

## II.   Motion for Reconsideration (Record Document 68)

Again, the Chesapeake Defendants seek reconsideration of this Court's holding that Section 30:10A(3) prevents an operator such as Chesapeake from recovering post-production costs from an unleased mineral owner. The Chesapeake Defendants now ask this Court to apply the doctrine of *negotiorum gestio*, as set forth in Louisiana Civil Code Article 2292, *et seq.*, as the mechanism for the operator to recover post-production costs from UMOs. In March 2020, the Motion for Reconsideration was set for oral argument on May 7, 2020. See Record Document 109. In April 2020, due to the COVID-19 pandemic, the Court reset oral argument for July 21, 2020. See Record Document 110. On June 29, 2020, the Chesapeake Defendants filed a Suggestion of Bankruptcy, resulting in this matter being stayed and the oral argument upset. See Record Document 120. The stay was lifted in January 2021 and video teleconference oral argument on the Motion for Reconsideration was held on March 10, 2021. See Record Documents 126, 129, and 130.

## LAW AND ANALYSIS

A.   **Motion for Reconsideration.**

While the Federal Rules of Civil Procedure do not recognize a motion for reconsideration *per se*, the Fifth Circuit has recognized that such motions may challenge a judgment or order under Rules 54(b), 59(e), or 60(b). See, e.g., Southern Snow Mfg. Co., Inc. v. SnoWizard Holdings, Inc., 921 F. Supp. 2d 548, 564 (E.D. La. 2013) (noting, however, that Rules 59 and 60 apply only to final judgments). Where a motion for reconsideration concerns an interlocutory order, as in the present case, the motion is generally evaluated under the standards that govern motions to alter or amend a judgment under Rule 59(e). See id. at 565. Under Rule 54(b), the court is given broad discretion to "reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." Melancon v. Texaco, Inc., 659 F.2d 551, 553 (5th Cir. 1981). "The exact standard applicable to the granting of a motion under Rule 54(b) is not clear, though it is typically held to be less exacting than would be a motion under Rule 59(e) ...." Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp., 259 F. Supp. 2d 471, 475 (M.D. La. 2002) (citations omitted). Generally, a motion to alter or amend a judgment under Rule 59(e) may be granted for the following grounds: "(1) to correct manifest errors of law or fact upon which judgment is based; (2) the availability of new evidence; (3) the need to prevent manifest injustice; or (4) an intervening change in controlling law." In re Self, 172 F. Supp. 2d 813, 816 (W.D. La. 2001).

Reconsideration is an extraordinary remedy. See Templet v. HydroChem Inc., 367 F.3d 473, 479 (5th Cir. 2004). Motions for reconsideration are "not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised

before the entry of judgment.... Rather, Rule 59(e) serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." Id. at 479 (citations omitted). "When there exists no independent reason for reconsideration other than mere disagreement with a prior order, reconsideration is a waste of judicial time and resources and should not be granted." Southern Snow Mfg. Co., Inc., 921 F. Supp. 2d at 566.

    Rule 56(a) provides, in pertinent part:

> Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

F.R.C.P. 56(a); see also Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir.2010).[2] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Quality Infusion Care, Inc., 628 F.3d at 728. "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir.2004).

    If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there

---

[2]The Court notes that amended Rule 56 requires that there be "no genuine dispute as to any material fact," but this change does not alter the Court's analysis. F.R.C.P. 56(a) and Advisory Committee Notes.

is a genuine issue for trial."  Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir.2004).  Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted.  See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir.2005).

"A partial summary judgment order is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case."  Streber v. Hunter, 221 F.3d 701, 737 (5th Cir.2000).  Partial summary judgment serves the purpose of rooting out, narrowing, and focusing the issues for trial.  See Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1415 (5th Cir.1993).

**B.     Relevant Statutory and Codal Schemes.**

Louisiana is one of many states that has forced pooling laws.  Louisiana's Commissioner of Conservation may join separate tracts of land into a forced drilling unit "whenever necessary to prevent waste or avoid needless drilling, even if owners of oil and gas interests have not agreed to pool their interests."  TDX Energy, L.L.C. v. Chesapeake Operating, Inc., 857 F.3d 253, 257 (5th Cir. 2017), citing La. R.S. §§ 30:9(B), 30:10(A)(1).[3]  Once a unit has been established, the Commissioner may appoint an operator to extract oil and gas from a reservoir.  See id., citing Hunt Oil Co. v. Batchelor, 93-3144 (La. 10/17/94), 644 So. 2d 191, 196.  "The operator is responsible for drilling within the unit but pays a proportionate share of production to owners of oil and gas interests for any acreage on which the operator does not have an oil and gas lease."  Id. at 257-258, citing La. R.S. § 30:10(A)(1)(b); Amoco Prod. Co. v. Thompson, 516 So. 2d 376, 392 (La. App. 1st Cir. 1987).

---

[3] La. R.S. 30:10 governs agreements for drilling units and pooling interests.

"As a corollary to this scheme for sharing the benefits of unit production in the absence of a contract, Louisiana law contains mechanisms for sharing drilling risks and costs." TDX, 857 F.3d at 258. Section 30:10(A)(2) provides:

> In the event pooling is required, the cost of development and operation of the pooled unit chargeable to the owners therein shall be determined and recovered as provided herein.

"To prevent free riding, the statute creates a mechanism for sharing the risk that a well, once drilled, will not produce enough to cover drilling costs." TDX, 857 F.3d at 258. "The operator gives notice to oil and gas interest owners regarding the drilling of a well, allowing owners to elect to participate in the risk by contributing to drilling costs up front." Id., citing § 30:10(A)(2)(a)(i). "If an owner does not participate, and the well produces, the operator can recover out of production the nonparticipating owner's share of expenditures [i.e., the actual reasonable expenditures incurred in drilling, testing, completing, equipping, and operating the unit well, including a charge for supervision], along with a risk charge of two hundred percent of the owner's expenditure share." Id., citing La. R.S. § 30:10(A)(2)(b)(i). However, Section 10(A)(2)(e) later provides that completely unleased mineral owners are exempt from the risk charge. See La. R.S. § 30:10(A)(2)(e)(i). Thus, under Section 10(A)(2), the costs of development and operation are chargeable to the owners – including unleased mineral owners – within a unit. Finally, and most relevant to the instant dispute, Section 10(A)(3) provides:

> If there is included in any unit created by the commissioner of conservation one or more *unleased interests* for which the party or parties entitled to market production therefrom have not made arrangements to separately dispose of the share of such production attributable to such tract, and the unit operator proceeds with the sale of unit production, then the unit operator *shall pay to such party or parties such tract's pro rata share of the proceeds of the sale of production within one hundred eighty days of such sale*.

La. R.S. 30:10(A)(3) (emphasis added).

The Louisiana Supreme Court has held that "a quasi-contractual relationship is created between the unit operator and the unleased mineral interest owner with whom the operator has not entered into contract." Wells v. Zadeck, 2011-1232 (La. 3/30/12), 89 So. 3d 1145, 1149. Such "relationship is personal and heritable." Id., citing King v. Strohe, 98–656 (La.App. 3 Cir. 5/8/96), 673 So. 2d 1329, 1339. When there is no written agreement between the owner and operator, Section 30:10(A)(3) supplies the terms of the contract. See Taylor v. Smith, 619 So. 2d 881, 887 (La. App. 3d Cir. 1993), writ denied, 625 So. 2d 1038 (La. 1993); see also Dow Constr., LLC v. BPX Operating Co., No. CV 20-9, 2021 WL 4492863, at *6 (W.D. La. Sept. 30, 2021) ("Section 10 was designed to be a comprehensive quasi-contract between mineral interest owners and the operator when they have not otherwise contracted with each other after having their interests forcibly pooled together."). "Essentially, the operator is entitled to sell the owner's proportionate share of production, but the operator must pay the owner within 180 days of the sale or found to be in breach of the statutory authorization to sell expressly set out in [Section] 30:10(A)." Smith, 619 So. 2d at 887. Section 30:10(A) "gives the owner a cause of action in quasi-contract under LSA-C.C. art. 2292, *et seq.*, insofar as the operator, in selling the owner's proportionate share of the oil produced, is acting as a *negotiorum gestor* or manager of the owner's business in selling the oil produced." Id.; see also King, 673 So. 2d at 1338 ("When there is no lessee, the mineral interest owner must deal directly with the unit operator, with whom he has no contractual relationship. In order to facilitate the sale of the minerals, La. R.S. 30:10(A)(3) provides a quasi-contractual relationship between the unit operator and the mineral interest owner."); J &

<u>L Fam., L.L.C. v. BHP Billiton Petroleum Properties (N.A.), L.P</u>, 293 F.Supp. 3d 615, 621 (W.D. La. 2018) ("[T]he Louisiana Third Circuit has held that the statutory protections for unleased owners 'give[ ] the [unleased] owner a cause of action in quasi-contract ... insofar as the operator, in selling the owner's proportionate share of the oil produced, is acting as a *negotiorum gestor* or manager of the owner's business in selling the oil produced.'").

> Louisiana Civil Code Article 2292 provides:
>
> There is a management of affairs when a person, the manager, acts without authority to protect the interests of another, the owner, in the reasonable belief that the owner would approve of the action if made aware of the circumstances.

The obligations of a unit operator as to an unleased mineral owner are imposed "without any agreement," and instead are "imposed by the sole authority of the laws." <u>Smith</u>, 619 So. 2d at 887. Louisiana Civil Code Article 2295, *et seq.*, "sets forth the quasi-contact which results from the transaction by one of another's business." <u>Id.</u> Article 2297 is of particular relevance in this matter and provides:

> The owner whose affair has been managed is bound to fulfill the obligations that the manager has undertaken as a *prudent administrator* and to reimburse the manager for all *necessary and useful expenses*.

La. C.C. Art. 2297 (emphasis added).

**C.     Analysis.**

The parties agree that the issue before the Court is *res nova* because there is no controlling Louisiana case law that deals with the specific facts as presented in this case. The key distinction in this dispute is the status of Plaintiffs as unleased mineral owners.

**The Chesapeake Defendants' Position**

The Chesapeake Defendants now argue that Section 10(A)(3) creates a quasi-contractual relationship of *negotiorum gestio* between the unit operator and UMOs when the operator sells production. According to the Chesapeake Defendants, this relationship occurs by operation of law. See Wells, 89 So. 3d 1145; King, 673 So. 2d 1329; Smith, 619 So. 2d 881. They submit that the express positive law set forth in Article 2297 – and not equity or gap filling – provides the right of reimbursement for post-production costs. Relying upon Louisiana Civil Code Article 13,[4] the Chesapeake Defendants maintain there is no conflict between Section 10(A)(3) and Article 2297 and the Court should harmonize these two expressions of positive law thereby allowing a right of reimbursement of necessary and useful expenses. They note that Section 10(A)(3) does not (1) expressly exclude the right of reimbursement under Article 2297; (2) expressly state that UMOs are entitled to payments of proceeds of sale without deduction for any post-production costs; (3) expressly exclude the creation of *negotiorum gestio* legal relationship; or (4) expressly refer to "gross" or "net" proceeds. The Chesapeake Defendants submit that the phrase "proceeds of the sale of production" in Section 10(A)(3) simply means "in cash" for balancing purposes, as compared to the "in kind" balancing preferred for other working interest owners. Alternatively, even if the Court were to construe "proceeds" in Section 10(A)(3) to mean "gross proceeds," then the

---

[4] Article 13 provides "laws on the same subject matter must be interpreted in reference to each other." La. C.C. Art. 13. When statutes seem to be in conflict, Article 13 makes it the court's "duty to harmonize and reconcile the acts if possible." State v. Walker, 97-0330 (La. 10/21/97), 700 So. 2d 496, 498. While the starting point for interpretation of a statute is the language of the statute itself, "all laws pertaining to the same subject matter must be interpreted *in pari materia*, or in reference to each other." Jackson v. Fam. Dollar Stores of Louisiana Inc., 2018-0170 (La. 6/27/18), 251 So. 3d 368, 370-371.

Chesapeake Defendants note that Section 10(A)(3) does not relieve UMOs of other obligations – such as severance taxes – that can be applied against the amount received. There is no dispute that operators are authorized to withhold severance taxes from payments of "proceeds" to UMOs and, according to the Chesapeake Defendants, there is no logical explanation as to why severance taxes can be deducted from "proceeds," but post-productions costs cannot.  See La. R.S. 47:635(2)(C).

**UMO Plaintiffs' Position**

The UMO Plaintiffs maintain reconsideration is an extraordinary remedy that is simply unnecessary in this instance because the issue before the Court involves a straightforward application of Louisiana statutory law and statutory construction.  They believe the Court correctly applied Section 10(A)(3) to this dispute.  The UMO Plaintiffs ask the Court to use the plain language of Section 10(A)(3) as the starting point of its analysis, arguing that this specific statutory provision governs the obligation of the operator as to what an unleased owner is to be paid for production from a compulsory unit.  Pursuant to Section 10(A)(3), the unleased owner is entitled to be paid his tract's "pro rata share of the proceeds of the sale of production." According to the UMO Plaintiffs, the statute is unambiguous because the ordinary meaning of "proceeds of the sale" is the entire amount of money received from or brought in by a sale.  See Record Document 85 at 18-22; Record Document 131 at 46.  The UMO Plaintiffs note that no other costs are listed in the statute as recoverable against unleased owners and maintain that Section 10(A)(3) is clear and unambiguous.  Thus, under Section 10(A)(3), post-production costs cannot be recovered by an operator from an unleased mineral owner's share of production proceeds.

The UMO Plaintiffs also do not dispute that the relationship between the operator and an unleased mineral owner is quasi-contractual in nature; however, they argue there is no "reason to think that every piece of *gestio* law is imported into the unitization statutes." Record Document 131 at 53. Notwithstanding, the UMO Plaintiffs submit that if the Court were to reconsider and apply *gestor* law, then they would seek leave to amend to seek application of a whole myriad of rights and obligations from the *gestor* articles, such as a *gestor* owing a fiduciary duty to the managed party and a *gestor* owing the managed party a proportionate share of profits obtained by way of management. See id. at 53-57.

**Ruling**

The Court now reconsiders its previous ruling and holds that the doctrine of *negotiorum gestio* – as set forth in Louisiana Civil Code Article 2292, *et seq.* – governs the quasi-contractual relationship between an operator and an unleased mineral owner, thereby providing the mechanism for reimbursement of post-production costs incurred by an operator to market the unleased mineral owner's gas. While silent as to this doctrine in the first round of motion practice, the Chesapeake Defendants have now pointed the Court to Louisiana case law – including a decision from the Louisiana Supreme Court – defining the relationship between an operator and UMOs as quasi-contractual and governed by not only the provisions of Section 10(A)(3), but also Article 2292, *et seq.* In Wells, the Louisiana Supreme Court held that "a quasi-contractual relationship is created between the unit operator and the unleased mineral interest owner with whom the operator has not entered into contract." Wells, 89 So. 3d at 1149. In Taylor v.

Woodpecker Corp., 93-0781 (La. App. 1st Cir. 3/11/94), 633 So. 2d 1308, 1313, a Louisiana appellate court explained:

> We agree that LSA–R.S. 30:10 A(3) gives an unleased landowner a cause of action in quasi-contract under these Civil Code articles. The unit operator acts as a *negotiorum gestor* or manager of the owner's business in selling the owner's proportionate share of oil and gas produced. In return for the right to sell the share of production of the unleased landowner, the unit operator is obligated by law "without any agreement" to pay the unleased landowner his proportionate share of proceeds within 180 days of the sale of production. The "purely voluntary act" of assuming the position of unit operator, and thereby obtaining the right to sell the unleased interest owner's share of production, results in this obligation to account to the unleased interest owner pursuant to LSA–R.S. 30:10 A(3).

Moreover, the Court is convinced that Section 10(A)(3) and Article 2297, which provides that a manager acting as a prudent administrator can recover necessary and useful expenses, can be read in harmony and are not in conflict. As argued by the Chesapeake Defendants, "silence isn't enough," meaning the statute's silence as to post-production costs is not enough to create conflict and/or displace other applicable provisions of the Civil Code. Record Document 131 at 26. For instance, in J & L Fam., L.L.C., 293 F.Supp.3d at 621, a sister court within the Western District of Louisiana looked to quasi-contractual provisions of the Civil Code to determine if an unleased mineral owner could recover attorney fees. The court reasoned:

> [T]he Louisiana Third Circuit has held that the statutory protections for unleased owners "give[ ] the [unleased] owner a cause of action in quasi-contract ... insofar as the operator, in selling the owner's proportionate share of the oil produced, is acting as a *negotiorum gestor* or manager of the owner's business in selling the oil produced." Taylor v. David New Operating Co., 619 So. 2d 1251, 1255 (La. Ct. App. 1993) (citing La. Stat. Ann. § 30:10(A)(3) ). J & L construes BHP's obligations as arising under the same statute interpreted by the Third Circuit. [Record Documents 1–2 at 10 and 58 at 5]. However, the quasi-contract provisions of the Civil Code do not provide for the fee recovery. See La. Civ. Code Ann. bk. III, tit. V, chs. 1–2 (2010). Therefore, there is no statutory authority for the Court to award attorney fees for any alleged breach of BHP's quasi-contractual obligations.

Id. at 621. This rationale supports this Court's finding that quasi-contractual provisions of the Civil Code can provide the mechanism for operator's to recover post-productions costs from UMOs.[5]

The parties have also focused on the meaning of "proceeds" in Section 10(A)(3). The statute provides in pertinent part, "the unit operator shall pay to such party or parties such tract's pro rata share of the proceeds of the sale of production within one hundred eighty days of such sale." La. R.S. 30:10(A)(3). The Chesapeake Defendants contend "proceeds of the sale of production" simply means "in cash" for balancing purposes or "the money [the UMOs got] from the sale" in lieu of the "in kind" balancing preferred for other working interest owners. Record Document 131 at 27. They argue the statute uses the word "proceeds" to contrast with "in-kind" balancing, and not as a reference to gross or net proceeds. See id. at 27-28; Hunt Oil, 644 So. 2d at 200 n.16; Amoco Prod. Co., 516 So. 2d at 392; King, 673 So. 2d at 1338. Conversely, the UMO Plaintiffs contend the ordinary meaning of "proceeds of the sale of production" is gross proceeds/the entire amount of money received from or brought in by the sale. See Record Document 131 at 46. However, as advanced alternatively by the Chesapeake Defendants, the Court does not believe it has to decide this issue. Even if "proceeds," as that term is used in Section 10(A)(3), means "gross proceeds," Section 10(A)(3) – when read in harmony with quasi-contractual principles set forth in the Civil Code – does not relieve an unleased mineral owner of other obligations that can be applied against the amount received. See Record Document 131 at 31-36. The parties do not dispute that operators are authorized to

---

[5] At this stage, the Court makes no findings as to what operator actions fall in line with those of a prudent administrator and/or what post-productions costs qualify as necessary and useful expenses under Article 2297.

withhold severance taxes from payments of "proceeds" to UMOs and, like the Chesapeake Defendants, the Court can find no plausible explanation why severance taxes can be deducted from "proceeds," but post-productions costs cannot. See La. R.S. 47:635(2)(C); see also J. Fleet Oil & Gas Corp., L.L.C. v. Chesapeake Louisiana, L.P., No. CV 15-2461, 2018 WL 1463529, at *6 (W.D. La. Mar. 22, 2018) ("Post-production costs are those costs and expenses incurred after the production has been discovered and delivered to the surface of the earth. Such 'subsequent to production' costs generally include those related to taxes, transportation, processing, dehydration, treating, compression, and gathering.").

The Court believes that the instant ruling harmonizes Section 10(A)(3) and Article 2297 and applies *in pari materia* statutory construction rules. The ruling is likewise consistent with how both parties agree severance taxes function in relation to operators and UMOs. Moreover, contrary to its prior ruling, the Court now believes there is no reason to treat UMOs differently in the specific context of post-production costs. In TDX, 587 F.3d at 263, the Fifth Circuit discussed certain greater protections given to UMOs, such as exemption from the risk charge. Likewise, other courts have focused on the UMOs' right to "in cash balancing" rather than "in kind" balancing. See Hunt Oil, 644 So.2d at 200 n.16; King, 673 So.2d at 1338. However, this Court now finds that it must look to the nature of the specific protection claimed and finds that to disallow the deduction of post-productions costs from UMOs would lead to "free riding." TDX, 587 F.3d at 258. The Chesapeake Defendants' Motion for Reconsideration is **GRANTED** and, in accordance with the doctrine of *negotiorum gestio*, operators such as Chesapeake may recover post-production costs from UMOs.

## CONCLUSION

Based on the foregoing analysis, the Court finds that reconsideration of its prior March 2019 ruling is proper pursuant to the broad discretion vested under Rule 54(b). The Court further notes that reconsideration was necessary to prevent manifest error as to the *res nova* issue set forth in the instant matter.[6]

Accordingly, the Motion for Reconsideration (Record Document 68) filed by the Chesapeake Defendants is **GRANTED**. Such reconsideration necessitates that the UMO Plaintiffs' Cross-Motion for Partial Summary Judgment (Record Document 28) be **DENIED** and the Chesapeake Defendants' Motion for Partial Summary Judgment (Record Document 24) be **GRANTED**. This Court now holds that the doctrine of *negotiorum gestio*, and more specifically Article 2297, provides the mechanism for an operator to recover post-production costs from unleased mineral owners.

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 31st day of March, 2022.

S. MAURICE HICKS, JR., CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[6] As discussed during oral argument, the Court is cognizant that the instant ruling will likely lead the UMO Plaintiffs to seek leave to amend their complaint in light of this ruling that principles of *negotiorum gestio* apply. See Record Document 131 at 55. Moreover, the Court fully expects a motion to certify this issue for interlocutory appeal to be filed.