**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

| | |
|---|---|
| ALLEN JOHNSON, ET AL. | CIVIL ACTION NO. 16-1543 |
| VERSUS | JUDGE S. MAURICE HICKS, JR. |
| CHESAPEAKE LOUISIANA, LP | MAGISTRATE JUDGE HORNSBY |

**MEMORANDUM RULING**

Before the Court is a Motion for Reconsideration (Record Document 68) and a Supplemental and Amended Memorandum in Support of the Motion for Reconsideration (Record Document 155) filed by Defendants, Chesapeake Louisiana, L.P. and Chesapeake Operating, L.L.C. (collectively "the Chesapeake Defendants" or "Chesapeake"). The Chesapeake Defendants seek to dismiss Plaintiffs' claim that post-production costs are not properly deductible from proceeds due to an unleased mineral interest owner ("UMO") pursuant to Louisiana Revised Statute 30:10(A)(3) ("La. R.S. 30:1(A)(3)"). The motion is opposed by Plaintiffs Allen Johnson, Linda Johnson, Donald A. Crosslin, Jr., Mary Jo Gragg, Rodney M. Hudson, Clifton Layman, Alfred R. Meshell, Sherman R. Meshell, David E. Oliver, Tracy Oliver, Laura S. Pendleton, Andrew L. Piccolo, Karla S. Piccolo, Randall S. Rodgers, Freddie P. Spohrer, Tim G. Taylor, Charles R. Waldon, Rexford Galen White, James Shope, Donna Shope, Charlotte McCune, and Jerry McCune oppose the Motion for Reconsideration (hereinafter "Plaintiffs" or "UMO Plaintiffs"). See Record Documents 70 & 159. The Chesapeake Defendants filed a reply. See Record Documents 79 & 165.

The Chesapeake Defendants' motion, as supplemented, came on for oral argument in February 2025. See Record Document 174. Post-argument briefing was

submitted by both parties. See Record Documents 175 & 176. The Chesapeake Defendants also filed two notices of supplemental authority regarding the United States Court of Appeals for the Fifth Circuit's June 9, 2025 opinion, Dow Construction, LLC v. BPX Operating Company, 140 F.4th 246 (5th Cir. 2025). See Record Documents 177 & 178.

In response to the Dow decision, the parties filed supplemental briefing in relation to Plaintiffs' Cross-Motion for Partial Summary Judgment (Record Document 28), which was originally filed in March 2018. The Chesapeake Defendants filed a Supplemental Memorandum in Opposition to Plaintiffs' Cross-Motion for Partial Summary Judgment. See Record Document 181. Plaintiffs filed a supplemental reply and the Chesapeake Defendants filed a sur-reply. See Record Documents 183 & 189. For the reasons set forth below, the Chesapeake Defendants' Motion for Reconsideration (Record Document 68) is **GRANTED IN PART AND DENIED IN PART**.

**BACKGROUND**

The Chesapeake Defendants were at all times relevant the operator of the Kelley Well, which is the unit well of the HA RA SU86 unit ("the Unit"). The UMO Plaintiffs are landowners within the Unit and own a non-operating, unleased interest in the Unit. In their Petition, the UMO Plaintiffs allege, among other claims, that the Chesapeake Defendants improperly deducted certain post-production costs from the UMO Plaintiffs' share of production proceeds. In particular, Plaintiffs contend that the Chesapeake Defendants have violated Louisiana law by charging or netting-out post-production costs from Plaintiffs' share of production secured from the Kelley Well. These post-production costs generally include gathering, compression, treatment, processing, transportation,

and dehydration costs. The procedural history of this case is long and varied and is set forth below.

**A. The Court's First Memorandum Ruling and Order (Record Documents 54 and 55)**

The Chesapeake Defendants moved for partial summary judgment, alleging that their deductions for post-production costs were authorized under general principles of unjust enrichment and, alternatively, co-ownership. See Record Document 24. The Chesapeake Defendants argued that La. R.S. 30:10 was inapplicable to the instant matter, as such statute is limited to development and operation costs and does not address post-production costs. The UMO Plaintiffs opposed the motion and filed their own cross-motion, arguing that general principles of co-ownership and unjust enrichment cannot supersede the positive statutory law governing their payment rights. See Record Document 28. They argued the statutory scheme set forth in La. R.S. 30:10 governs and that post-production costs were not among the exclusive list of expenses deductible against unleased owners.

Alternatively, Plaintiffs argued that in the event post-production costs were held to be operating costs, then Chesapeake has forfeited the right under La. R.S. 30:103.2 to charge all costs of drilling operations. See Record Document 28-2 at 23. Plaintiffs submit that none of the quarterly reports Chesapeake sent to them have ever referenced post-production expenses, much less listed such expenses in a detailed and itemized format. See id. at 23-24. Plaintiffs submitted as exhibits two reports from December 2009 and December 2017 and note that neither report contained entries from expenses related to gathering, transportation, compression, or other marketing expenses. See id. at 24; see also Record Documents 28-13 & 28-14. Plaintiffs argue that Chesapeake has forfeited

the right to contribution for all costs of drilling operations under La. R.S. 30:103.1 by failing to include post-production charges in the quarterly reports. See Record Document 28-2 at 26.

In May 2018, the Court heard oral argument on the cross-motions for summary judgment. See Record Document 50. The Court held that La. R.S. 30:10(A)(3) governed the instant dispute:

> Because the Legislature has provided a statutory scheme, this Court will not resort to equity or other principles of Louisiana law to modify or supplement the statute. Under Section 10(A)(3), post-production costs cannot be recovered by an operator from an unleased mineral owner's share of production proceeds.

Record Document 54 at 10. The UMO Plaintiffs' Cross-Motion for Partial Summary Judgment (Record Document 28) was granted and the Chesapeake Defendants' Motion for Partial Summary Judgment (Record Document 24) was denied. See id. The Court never reached Plaintiffs' alternative argument regarding forfeiture under La. R.S. 30:103.2.

**B. Motion for Reconsideration (Record Document 68)**

In May 2019, the Chesapeake Defendants sought reconsideration of this Court's holding that La. R.S. 30:10(A)(3) prevents an operator such as Chesapeake from recovering post-production costs from an unleased mineral owner. See Record Document 68. The Chesapeake Defendants asked the Court to apply the doctrine of *negotiorum gestio*, as set forth in Louisiana Civil Code Article 2292, *et seq.*, as the mechanism for the operator to recover post-production costs from UMOs. See id. The Motion for Reconsideration was orally argued via video teleconference on March 10, 2021. See Record Document 130.

In March 2022, the Court reconsidered its previous ruling and held that the doctrine of *negotiorum gestio* – as set forth in Louisiana Civil Code Article 2292, *et seq.* – governed the quasi-contractual relationship between an operator and an unleased mineral owner, thereby providing the mechanism for reimbursement of post-production costs incurred by an operator to market the unleased mineral owner's gas. See Record Documents 138 & 139.

**C. Fifth Circuit Appeal**

In April 2022, the Court certified the March 2022 ruling on *negotiorum gestio* for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). See Record Document 142. The Fifth Circuit granted the motion for leave to appeal an interlocutory order. See Record Document 143. This case was consolidated for oral argument with a sister case, Self v. BPX Operating Co., 22-30243, which raised the same statutory interpretation issue. See Record Document 147. In both cases, the Fifth Circuit certified the following question to the Louisiana Supreme Court: "Does La. Civ. Code art. 2292 apply to unit operators selling production in accordance with La. R.S. 30:10(A)(3)?" Johnson v. Chesapeake La., L.P., 87 F.4th 305, 311 (5th Cir. 2023); Self v. BPX Operating Co., 80 F.4th 632, 637 (5th Cir. 2023). See id. The Louisiana Supreme Court accepted certification and concluded that *negotiorum gestio* does not apply to unit operators selling production in accordance with La. R.S. 30:10(A)(3). See id. Thus, this Court's order granting the motion for reconsideration was vacated, and the case was remanded for further proceedings consistent with the Louisiana Supreme Court's opinion. See id.

## D. Proceedings on Remand

After a telephone status conference with this Court, the Chesapeake Defendants reurged their Motion for Reconsideration (Record Document 68) and filed a Supplemental Memorandum in Support of the Motion for Reconsideration (Record Document 155). The Chesapeake Defendants offer co-ownership, tacit mandate, legal representation, and unjust enrichment as codal bases for the legal reimbursement of post-production costs from UMOs. The Chesapeake Defendants also identified good faith possessor of products as an alternative codal basis, but that theory was withdrawn at oral argument. Following post-argument supplemental briefing and the Fifth Circuit's Dow decision, the Chesapeake Defendants' Motion for Reconsideration is ripe for decision.

# LAW AND ANALYSIS

## A. Motion for Reconsideration and Motion for Partial Summary Judgment Standard

While the Federal Rules of Civil Procedure do not recognize a motion for reconsideration *per se*, the Fifth Circuit has recognized that such motions may challenge a judgment or order under Rules 54(b), 59(e), or 60(b). See, e.g., Southern Snow Mfg. Co., Inc. v. SnoWizard Holdings, Inc., 921 F. Supp. 2d 548, 564 (E.D. La. 2013) (noting, however, that Rules 59 and 60 apply only to final judgments). Where a motion for reconsideration concerns an interlocutory order, as in the present case, the motion is generally evaluated under the standards that govern motions to alter or amend a judgment under Rule 59(e). See id. at 565. Under Rule 54(b), the court is given broad discretion to "reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient." Melancon v. Texaco, Inc., 659 F.2d 551, 553 (5th Cir. 1981). "The exact standard applicable to the granting of a motion under Rule 54(b) is not clear, though it is

typically held to be less exacting than would be a motion under Rule 59(e) ...." Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp., 259 F. Supp. 2d 471, 475 (M.D. La. 2002) (citations omitted). Generally, a motion to alter or amend a judgment under Rule 59(e) may be granted for the following grounds: "(1) to correct manifest errors of law or fact upon which judgment is based; (2) the availability of new evidence; (3) the need to prevent manifest injustice; or (4) an intervening change in controlling law." In re Self, 172 F. Supp. 2d 813, 816 (W.D. La. 2001).

Reconsideration is an extraordinary remedy. See Templet v. HydroChem Inc., 367 F.3d 473, 479 (5th Cir. 2004). Motions for reconsideration are "not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment.... Rather, Rule 59(e) serve[s] the narrow purpose of allowing a party to correct manifest errors of law or fact or to present newly discovered evidence." Id. at 479 (citations omitted). "When there exists no independent reason for reconsideration other than mere disagreement with a prior order, reconsideration is a waste of judicial time and resources and should not be granted." Southern Snow Mfg. Co., Inc., 921 F. Supp. 2d at 566.

Rule 56(a) provides, in pertinent part:

> Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense–or the part of each claim or defense–on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

F.R.C.P. 56(a); see also Quality Infusion Care, Inc. v. Health Care Serv. Corp., 628 F.3d 725, 728 (5th Cir.2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Quality

Infusion Care, Inc., 628 F.3d at 728. "Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Patrick v. Ridge, 394 F.3d 311, 315 (5th Cir.2004).

If the movant demonstrates the absence of a genuine dispute of material fact, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir.2004). Where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant, then summary judgment should be granted. See Boudreaux v. Swift Transp. Co., 402 F.3d 536, 540 (5th Cir.2005).

"A partial summary judgment order is not a final judgment but is merely a pre-trial adjudication that certain issues are established for trial of the case." Streber v. Hunter, 221 F.3d 701, 737 (5th Cir.2000). Partial summary judgment serves the purpose of rooting out, narrowing, and focusing the issues for trial. See Calpetco 1981 v. Marshall Exploration, Inc., 989 F.2d 1408, 1415 (5th Cir.1993).

**B. Relevant Statutory and Codal Schemes**

Louisiana is one of many states that has forced pooling laws. Louisiana's Commissioner of Conservation may join separate tracts of land into a forced drilling unit "whenever necessary to prevent waste or avoid needless drilling, even if owners of oil and gas interests have not agreed to pool their interests." TDX Energy, L.L.C. v. Chesapeake Operating, Inc., 857 F.3d 253, 257 (5th Cir. 2017), citing La. R.S. §§ 30:9(B),

30:10(A)(1).[1] Once a unit has been established, the Commissioner may appoint an operator to extract oil and gas from a reservoir. See id., citing Hunt Oil Co. v. Batchelor, 93-3144 (La. 10/17/94), 644 So. 2d 191, 196. "The operator is responsible for drilling within the unit but pays a proportionate share of production to owners of oil and gas interests for any acreage on which the operator does not have an oil and gas lease." Id. at 257-258, citing La. R.S. § 30:10(A)(1)(b); Amoco Prod. Co. v. Thompson, 516 So. 2d 376, 392 (La. App. 1st Cir. 1987).

"As a corollary to this scheme for sharing the benefits of unit production in the absence of a contract, Louisiana law contains mechanisms for sharing drilling risks and costs." TDX, 857 F.3d at 258. La. R.S. § 30:10(A)(2) (emphasis added) provides:

> In the event pooling is required, the *cost of development and operation* of the pooled unit chargeable to the owners therein shall be determined and recovered as provided herein.

"To prevent free riding, the statute creates a mechanism for sharing the risk that a well, once drilled, will not produce enough to cover drilling costs." TDX, 857 F.3d at 258. "The operator gives notice to oil and gas interest owners regarding the drilling of a well, allowing owners to elect to participate in the risk by contributing to drilling costs up front." Id., citing La. Stat. Ann. § 30:10(A)(2)(a)(i). "If an owner does not participate, and the well produces, the operator can recover out of production the nonparticipating owner's share of expenditures [i.e., the actual reasonable expenditures incurred in drilling, testing, completing, equipping, and operating the unit well, including a charge for supervision], along with a risk charge of two hundred percent of the owner's expenditure share." Id.,

[1] Title 30 of the Louisiana Revised Statutes governs minerals, oils, and gas and environmental quality. More specifically, La. R.S. § 30:10 governs agreements for drilling units and pooling interests.

citing La. R.S. § 30:10(A)(2)(b)(i). However, Section 10(A)(2)(e) later provides that completely unleased mineral owners are exempt from the risk charge. See La. Stat. Ann. § 30:10(A)(2)(e)(i). Thus, under Section 10(A)(2), the costs of development and operation are chargeable to the owners – including UMOs – within a unit. Finally, and most relevant to the instant dispute, Section 10(A)(3) provides:

> If there is included in any unit created by the commissioner of conservation one or more *unleased interests* for which the party or parties entitled to market production therefrom have not made arrangements to separately dispose of the share of such production attributable to such tract, and the unit operator proceeds with the sale of unit production, then the unit operator *shall pay to such party or parties such tract's pro rata share of the proceeds of the sale of production within one hundred eighty days of such sale*.

La. Stat. Ann. § 30:10(A)(3) (emphasis added).

Additionally, pursuant to La. R.S. 30:103.1, at an unleased owner's request, operators must issue reports containing sworn statements about the drilling and operating costs, amount of production, and price received for sale of production. See Dow, 140 F.4th at 249. If the operator does not provide this information within ninety days of completing a well, and thirty additional days lapse after receiving notice of its failure to comply with its reporting obligation, then the operator forfeits its right to demand contribution for the costs of the drilling operations. See La. Stat. Ann. § 30:103.2.

**C. Dow Construction, LLC v. BPX Operating Company, 140 F.4th 246 (5th Cir. 2025).**

In Dow, the Fifth Circuit considered four issues: "A) whether § 30:10(A)(3) applies to any mineral interest owner in a forced pool unit who has no lease whatsoever or who specifically has no lease with the operator of the well; B) whether § 30:10 precludes operators from seeking reimbursement of post-production costs incurred by operators

when they market an unleased owner's share of production; C) whether post-production costs are included within the forfeiture provision, § 30:103.2; and D) whether § 30:103.2 is subject to a one-year or ten-year perspective period." Dow, 140 F.4th at 250. The court first held that La. R.S. 30:10(A)(3) applies to mineral interest owners who are unleased as to the well operator. See id. at 253. As to post-production costs, the Fifth Circuit vacated the district court's order insofar as it granted BPX partial summary judgment based on the holding that *negotiorum gestio* allows operators to recover post-production costs incurred to market the mineral interest owner's share of production, and remanded for further proceedings consistent with the Louisiana Supreme Court's opinion. See id. As to the fourth issue, the court concluded that La. R.S. 30:103.2 is subject to the one-year prescriptive period that applies to delictual claims. See id. at 256.

In regards to the instant matter, the Fifth Circuit's holding on the third issue – that post-production costs are included within the forfeiture provision of La. R.S. 30:103.2 – is significant. Section 103.2 provides that when an operator fails to timely provide the information required of them by La. R.S. 30:103.1, the operator loses the "right to demand contribution from the owner or owners of the unleased oil and gas interests for the *costs of the drilling operations* of the well." La. Stat. Ann. § 30:103.2 (emphasis added). Section 103.1, in turn, provides that:

> A. Whenever there is included within a drilling unit, as authorized by the commissioner of conservation, lands producing oil or gas, or both, upon which the operator or producer has no valid oil, gas, or mineral lease, said operator or producer shall issue the following reports to the owners of said interests by a sworn, detailed, itemized statement:
>
> (1) Within ninety calendar days from completion of the well, an initial report which shall contain the costs of drilling, completing, and equipping the unit well.

(2) After establishment of production from the unit well, quarterly reports which shall contain the following:

(a) The total amount of oil, gas, or other hydrocarbons produced from the lands during the previous quarter.

(b) The price received from any purchaser of unit production.

(c) Quarterly operating costs and expenses.

(d) Any additional funds expended to enhance or restore the production of the unit well.

...

D. Notwithstanding any other provision of this Section to the contrary, at the time a report is due pursuant to this Section, if the share of the *total costs of drilling, completing, and equipping the unit well and all other unit costs* allocable to an owner of an unleased interest is less than one thousand dollars, no report shall be required. However, during January of the next calendar year, the operator or producer shall report *such costs* to the owner.

La. R.S. § 30:103.1 (emphasis added). The Fifth Circuit described the interplay between Sections 103.1 and 103.2:

> Section 103.2 adds teeth to § 103.1; it disincentivizes operators' failure to comply with § 103.1's reporting requirements. Taken together, §§ 103.1 and 103.2 address an information asymmetry that arises from the forced pooling of mineral resources when there is no lease or contract between the operator and the owner of the oil and gas .... Thus, §§ 103.1 and 103.2 help remedy the information asymmetry by creating an enforceable mechanism for nonoperators that have unleased interests in the minerals to obtain an accounting of what the operator is doing.

Dow, 140 F.4th at 254, citing B. A. Kelly Land Co. v. Aethon Energy Operating, L.L.C., 25 F.4th 369, 376 (5th Cir. 2022) (citations and internal quotation marks omitted).

The parties in Dow disputed "which costs are covered by the phrase 'costs of drilling operations' in § 103.2." Dow, 140 F.4th at 254. BPX argued the phrase only encompassed the enumerated set of specific drilling costs. See id. Conversely, Dow

asserted that "costs of the drilling operations" refers back to the expenditures referenced in Section 103.1. Id. Dow further argued that "operating costs and expenses" and "funds expended to enhance . . . the production of the unit well," capture post-production costs; therefore, Dow maintained that "costs of [the] drilling operations" includes post-production costs as well. See id.

The Fifth Circuit looked to Louisiana case law for guidance and relied upon XXI Oil & Gas, LLC v. Hilcorp Energy Co., 2016-269 (La. App. 3 Cir. 9/28/16), 206 So. 3d 885. "There, the Louisiana Third Circuit Court of Appeal held that the penalty for 'costs of the drilling operations' include[d] both pre-and post-production costs." Dow, 140 F.4 at 254, citing XXI Oil & Gas, 206 So. 3d at 890. The Louisiana appellate court considered legislative history and "determined that the legislature used the phrase 'cost of the drilling operations' to refer back to the expenditures referenced in § 103.1." Id., citing XXI Oil & Gas, 206 So. 3d at 890. The rationale underlying the determination was that the term "drilling operations" connotes both drilling and operational aspects of taking and producing oil and gas from land because otherwise, "there would be no incentive for the operator or producer to provide the quarterly reports." Id., citing XXI Oil & Gas, 206 So. 3d at 890.

The Fifth Circuit further reasoned that the text of § 103.1 "requires reporting multiple categories of costs that could encompass post-production costs." Id. at 255. For example, the court believed it was reasonable to classify post-production costs as "operating costs and expenses" under § 103.1(A)(2)(c) because they form an integral part of the overall business operations. Id. The value of minerals is contingent upon a series of post-production actions, such as transportation, marketing, processing, dehydration,

treatment, compression, and collection, that must be taken to render the minerals useful. See id. The Fifth Circuit further held that its interpretation was consistent with the purpose of Louisiana's forced-pooling statutory scheme, that is, to remedy information asymmetry. See id. The court believes that "to accept BPX's argument would mean reading an information asymmetry safe haven into a statute created to remedy information asymmetries." Id.

**C. Analysis**

In Dow, the Fifth Circuit held that post-production costs are included in the forfeiture provision of Section 103.2 as "operating costs and expenses" under Section 103.1(A)(2)(c) and as "all other unit costs allocable to an owner" under Section 103.1(D). Dow, 140 F.4th at 255. This finding necessarily indicates post-production costs are legally chargeable to the UMO in the first instance; thus, this Court finds post-production costs are deductible from a UMO's proceeds.

This Court believes that a contrary holding would lead to absurd results. Under Dow, Louisiana's statutory scheme requires an operator to report post-production costs and/or forfeit the right to demand post-production costs from the owner. If an operator does not have the right to withhold post-production costs, there would be no reason for the operator to report post-production costs. Likewise, there would be no right relative to post-production costs that could be forfeited by the operator under Section 103.2. There can be no reporting or forfeiture of costs for which an operator bears full responsibility.

Dow construed the meaning of operating costs consistently within the confines of both La. R.S. 30:10 and La. R.S. 30:103.1 *et seq.*, thereby promoting statutory harmony and the consistent interpretation of conservation laws.[2] Plaintiffs have previously argued:

> However, if the Court does agree with Chesapeake that marketing expenses are operating costs and therefore deductible, Plaintiffs request that such holding be accompanied by a ruling that Chesapeake has failed to live up to its reporting requirements under La. R.S. 30:103.1. Without such a ruling, Plaintiffs would be left with an inconsistent and absurd result: marketing costs are deductible "operating costs" under 30:10A(2) but are not "operating costs" that must be reported under 30:103.1. If Chesapeake is right that marketing costs are operating expenses, consistent interpretation of the conservation laws compels the conclusion that Chesapeake has failed to comply with 30:103.1 by not including such costs in its reports.

Record Document 28-2 at 26-2, Allen Johnson, et al. v. Chesapeake Louisiana, L.P., et al., 5:16-cv-1543. Here, because operating costs are interpreted consistently as to both La. R.S. 30:10 and La. R.S. 103.1 *et seq.*, it is clear that post-production costs are deductible as operating costs under La. R.S. 30:10(A)(2)(b)(i).[3] Dow, therefore, provides the bases within conservation law to support the legal deductibility of post-production costs against UMOs claiming cash under La. R.S. 30:10(A)(3). Thus, the Chesapeake

[2] Article 13 provides "laws on the same subject matter must be interpreted in reference to each other." La. C.C. Art. 13. When statutes seem to be in conflict, Article 13 makes it the court's "duty to harmonize and reconcile the acts if possible." State v. Walker, 97-0330 (La. 10/21/97), 700 So. 2d 496, 498. While the starting point for interpretation of a statute is the language of the statute itself, "all laws pertaining to the same subject matter must be interpreted *in pari materia*, or in reference to each other." Jackson v. Fam. Dollar Stores of Louisiana Inc., 2018-0170 (La. 6/27/18), 251 So. 3d 368, 370-371.

[3] In J. Fleet Oil & Gas Corp., LLC v. Chesapeake La., L.P., No. 15-2461, 2019 WL 13219402, *4 (W.D. La. June 7, 2019), in which this Court held, in the context of construing a Participation Agreement, that "operating expenses" are a type of production cost and therefore do not encompass post-production costs. Nevertheless, the Fifth Circuit's ruling in Dow functionally overrules this Court's conclusion, at least insofar as the term "operating expenses" is used in La. R.S. 30:10 and La. R.S. 30:103.1.

Defendants' Motion for Reconsideration is **GRANTED** to the extent that this Court now holds that post-production costs are deductible as operating costs under La. R.S. 30:10(A)(2)(b)(i).

Dow's construction of operating costs further explains the parties' supplemental briefing relating to Plaintiffs' alternative argument in its Cross-Motion for Partial Summary Judgment that "in the event post-production costs are held to be operating costs, Chesapeake has forfeited the right to charge all costs of drilled operations" by failing to detail these costs in its reporting. Record Document 181; Record Document 28-2 at 23-26. The Chesapeake Defendants ask the Court to consider compliance with the dual notice requirement as set forth in La. R.S. 30:103.1 and 103.2 and prescription. See Record Document 181 at 5. This Court has never addressed any of these issues. While this Court enjoys broad discretion under Rule 54(b) to "reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient," there is no interlocutory order to reconsider, rescind, or modify on the issues of forfeiture, dual notice, and/or prescription. Because reconsideration is an extraordinary remedy, the Court believes the better approach is to have the parties file cross-motions for partial summary judgment specifically directed to forfeiture, dual notice, and/or prescription. Such motions shall be filed no later than **October 21, 2026**.

**CONCLUSION**

Based on the foregoing analysis, the Court finds that reconsideration is proper and now holds that post-production costs are deductible as operating costs under La. R.S. 30:10(A)(2)(b)(i). However, to the extent that the Chesapeake Defendants seek a ruling on the issues of forfeiture, dual notice, and/or prescription, reconsideration is improper.

Accordingly, the Chesapeake Defendants' Motion for Reconsideration (Record Document 68) is **GRANTED IN PART AND DENIED IN PART**.

An order consistent with the terms of the instant Memorandum Ruling shall issue herewith.

**THUS DONE AND SIGNED**, in Shreveport, Louisiana, this 30th day of September, 2026.

United States District Judge